The BANK OF NEW YORK MELLON, solely in its capacity as Property Trustee pursuant to a certain Amended and Restated Trust Agreement described below, Plaintiff Below, Appellant,

v.

COMMERZBANK CAPITAL FUNDING TRUST II; Commerzbank Capital Funding LLC II; and Commerzbank Aktiengesellschaft, Defendants Below, Appellees.

No. 372, 2012.

Supreme Court of Delaware.

Submitted: Feb. 5, 2013.
Decided: March 19, 2013.
Reargument Denied May 2, 2013.

Collins J. Seitz, Jr. (argued), Garrett B. Moritz, and S. Michael Sirkin, Esquires, Seitz Ross Aronstam & Moritz LLP, Wilmington, Delaware; Of Counsel: Sigmund S. Wissner–Gross, Esquire, Brown Rudnick LLP, New York, NY; for Appellant.

William M. Lafferty, Thomas W. Briggs, Jr., and Ryan D. Stottmann, Esquires, Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware; Of Counsel: Lawrence Byrne, Martin S. Bloor (argued), and Patrick C. Ashby, Esquires, Linklaters LLP, New York, NY; for Appellees.

Before STEELE, Chief Justice, HOLLAND, BERGER, JACOBS and RIDGELY, Justices, constituting the Court en Banc.

JACOBS, Justice.

In 2006, a German bank organized two affiliated entities under Delaware law. One of those entities sold a class of securities—Trust Preferred Securities—to investors as part of the bank's effort to raise capital. In 2009, the bank acquired a second German bank by merger, whereby the bank assumed an obligation of the acquired bank to make certain payments with respect to a class of the acquired bank's securities. Post-merger, the bank made those payments in 2009 and 2010. In 2010, the Plaintiff, who is the Property Trustee for the holders of the acquiror bank's Trust Preferred Securities ("Trustee"), filed this action in the Court of Chancery. The Trustee claimed that the 2009 and 2010 payments on the acquired bank's securities, which was a "Parity Security," triggered a contractual obligation by the bank to make comparable payments on the Trust Preferred Securities. The bank took the position that it had no such contractual obligation.

On cross motions for summary judgment, the Court of Chancery rejected the Trustee's claim on the basis that, because the 2009 and 2010 payments were not made on "Parity Securities," the bank had

no obligation to make payments on the Trust Preferred Securities. Having decided that question, the court declined to reach the other issues generated by the Trustee's claim. Because we conclude that the Court of Chancery erred, we reverse and remand with instructions to enter final judgment for the Trustee consistent with the rulings in this Opinion.

## FACTS AND PROCEDURAL HISTORY

### I. Background

#### A. The Parties and Relevant Agreements

In 2006, Commerzbank *Aktiengesellschaft* ("Commerzbank" or the "Bank"), a German stock corporation and international bank, formed two affiliated entities. One of them, Commerzbank Capital Funding LLC II (the "Company"), is a Delaware LLC that is governed by an Amended and Restated Limited Liability Company Agreement ("LLC Agreement"). The other, Commerzbank Capital Funding Trust II ("Trust II"), is a Delaware entity governed by an Amended and Restated Trust Agreement ("Trust II Agreement"). The LLC Agreement and Trust II Agreement, both executed on March 30, 2006, are governed by Delaware law. That same day, the Bank and the Company entered into a separate, third agreement—the Support Undertaking—that is governed by German law. These three entities—the Bank, and its two affiliates, the Company, and Trust II—are the defendants in this action (collectively, "Defendants").

The Company and Trust II were formed to issue and sell trust preferred securities, in order to raise "consolidated Tier I regulatory capital" for the Bank.[1] Accordingly,

---

1. The various categories of bank capital under German law are described more fully in Sec- tion I.B., *infra,* of this Opinion.

Trust II issued and sold Trust Preferred Securities to investors for that purpose.[2] The Bank of New York Mellon became the Property Trustee for the holders of the Trust Preferred Securities, and in that capacity represents the interests of those public investors in this action.

In 2009, Commerzbank acquired a second German bank, Dresdner Bank AG ("Dresdner Bank"), by merger. In that merger, the Bank assumed all of Dresdner Bank's assets, liabilities, and contractual obligations—including Dresdner Bank's obligation to make certain capital payments and distributions with respect to its DresCap Trust Certificates. Discharging that assumed obligation, the Bank made payments on the DresCap Trust Certificates in 2009 and 2010. The Bank (acting through Trust II) also made payments on its own Trust Preferred Securities in 2009. After 2009, no further payments on the Trust Preferred Securities were made.

### B. The Defendants' Capital Structure and The Relationships Among the Affiliated Entities

Under German law, the Bank's capital is classified as either Tier I ("core") capital, Tier II ("supplementary") capital, or Tier III capital. Tier I capital is "the core measure of a bank's financial strength for regulatory purposes and consists primarily of common stock and disclosed reserves, but [it] may also include non-redeemable, non-cumulative preferred stock."[3] Tier II capital consists of primarily subscribed capital, undisclosed reserves, and long-term subordinated liabilities.[4] Both Tier I and Tier II capital are subordinate to any senior debt instruments. Tier III capital consists of short-term subordinated liabilities. Because Tier III capital is not implicated on this appeal, no further reference to it is made in this Opinion.

After issuing the Trust Preferred Securities in 2006, Trust II used the sale proceeds to purchase Class B Preferred Securities issued by the Company. The Company, in turn, used those sale proceeds to purchase Initial Debt Securities (subordinated notes) from the Bank. These sales occurred at the direction of the Bank, which controls both the Company and Trust II through its ownership of the Company's and Trust II's common and preferred securities. In this round-

---

**2.** The Trust Preferred Securities have characteristics of both debt and equity. *The Bank of New York Mellon v. Commerzbank*, No. 372, 2012 (Del. Feb. 5, 2013), *available at* http://courts.delaware.gov/Supreme/audioargs.stm. Therefore, they are classified as "hybrid capital," *i.e.*, capital with elements of both debt and equity. U.S. Government Accountability Office, *Hybrid Capital Instruments and Small Institution Access to Capital* (Jan. 18, 2012), http://www.gao.gov/products/GAO-12-237 ("Hybrid capital instruments are securities that have characteristics of both equity and debt.").

**3.** Matthew Berger, *Securitization and Capital Implications Under the Basel II Accord*, 30:1 BANKING & FIN. SERVS. POL'Y REP. 6, 9 (2011), *available at* http://wenku.baidu.com/view/70096384bceb19e8b8f6bae7 ("Berger"); *see The Bank of New York Mellon v. Commerz-* *bank*, C.A. No. 5580-VCN, slip op. at 3, 2011 WL 3360024 (Del. Ch. Aug. 4, 2011) (cited herein as "Op.").

Tier I capital is further broken down into: 1) Tier I regulatory capital of the Bank, and 2) *consolidated* Tier I regulatory capital of the Bank. Tier I regulatory capital consists of securities that the Bank directly issues itself. Op. at 23 n. 74. *Consolidated* Tier I regulatory capital of the Bank includes securities issued by the Bank's affiliates and subsidiaries. *Id.*

**4.** Berger, *supra* note 3 at 9; Op. at 3. Tier II capital is sub-divided into Upper Tier II capital and Lower Tier II capital. Berger, *supra* note 3 at 9; Op. at 3. Upper Tier II capital "must be perpetual and may have interest payments on it deferred," whereas Lower Tier II capital need not possess those attributes. Op. at 3.

about way, these payments found their way to the Bank and became part of its capital. The flow of those payments, and the relationship among the defendant entities, is depicted in the chart below:

For our purposes, what is important is the flow of money to and from the public investors. Under the intricate capital payment structure depicted above, the Bank's distributions on its Initial Debt Securities served to fund the distributions on the Company's Class B Preferred Securities. Trust II, in turn, used the distributions it received on the Class B Preferred Securities to make capital payments to the holders of the Trust Preferred Securities.

In addition to, and apart from, the LLC Agreement and the Trust II Agreement, there is a third agreement implicated on this appeal—the Support Undertaking. That Undertaking contractually obligates the Bank to elevate the priority right to payment of the Trust Preferred Securities, in specified circumstances discussed more fully below. The Trustee, which holds the Class B Preferred Securities for the benefit of the Trust Preferred Securities holders, is a third-party beneficiary of the Support Undertaking. Both the Class B Preferred Securities and the Trust Preferred Securities are profit-dependent, meaning that payments on them are due only if and when the Bank is deemed profitable under the criteria of the LLC Agreement.

### C. Capital Payment Requirements For Trust Preferred Securities

The LLC Agreement requires the Company to make capital payments on its Class B Preferred Securities (which, in turn, fund Trust II's payments on the Trust Preferred Securities) in one of two circumstances: (1) if the Company has operating profits, and the Bank has distributable profits; or (2) if a capital payment is "deemed" declared.[5] A capital payment is "deemed" declared, if: (a) "the Bank or any of its subsidiaries declares or pays any capital payments, dividends or other distributions on any Parity Securities in any Fiscal Year," and (b) "the Company does not declare" a capital payment even though it is authorized to do so.[6]

This case focuses on the Company's obligations under the LLC Agreement to make a capital payment on its Class B Preferred Securities where the Bank makes a payment on a "Parity Securit[y]." That obligation arises under the so-called "Pusher Provision" of the LLC Agreement, which mandates that:

> [I]f the Bank or any of its subsidiaries declares or pays any capital payments, dividends or other distributions on any Parity Securities in any Fiscal Year,

---

5. LLC Ag. § 7.04(b)(ix).

6. LLC Ag. § 9.01(b).

Capital Payments shall be authorized to be declared and paid on the Class B Payment Date falling contemporaneously with or immediately after the date on which such capital payment, dividend or other distribution [was] made.... [7]

At the heart of the parties' dispute is the question: what is a "Parity Security"? "Parity Securities" are defined in the LLC Agreement as:

(i) each class of the most senior ranking preference shares of the Bank, if any, or other instruments of the Bank qualifying as the most senior form of Tier I regulatory capital of the Bank and (ii) preference shares or other instruments qualifying as consolidated Tier I regulatory capital of the Bank or any other instrument of any Affiliate of the Bank subject to any guarantee or support agreement of the Bank ranking *pari passu* with the obligations of the Bank under the Support Undertaking.... [8]

The Support Undertaking reinforces those obligations. That agreement provides that where the Company is required to—but does not—make a capital payment on the Class B Preferred Securities, the Bank "ensure[s] that the Company shall at all times be in a position to meet its obligations if such obligations are due and payable, including its obligations to pay Capital Payments" on the Class B Preferred Securities. Section 6 of the Support Undertaking mandates that the Bank:

... shall not give any guarantee or similar undertaking with respect to, or enter into any other agreement relating to the support or payment of any amounts in respect of any other Parity Securities or Junior Securities that would in any regard rank senior in right of payment to the Bank's obligations under this Agreement, unless the parties hereto modify this Agreement such that the Bank's obligations under this Agreement rank at least *pari passu* with, and contain substantially equivalent rights of priority as to payment as such guarantee or support agreement relating to Parity Securities.[9]

Put differently, the Bank guaranteed in the Support Undertaking that it would not elevate the priority right to payment of any Parity Security above that of any other security (including the Trust Preferred Securities), unless the Bank and the Company modify the Support Undertaking to permit that priority elevation. That guarantee is one of the contract rights that the Trustee seeks to enforce in this action.

## II. The Events Leading To This Litigation

### A. The Dresdner Bank Merger

As earlier noted, when the Bank acquired Dresdner Bank by merger on May 11, 2009, it assumed all of Dresdner Bank's assets, liabilities, and contractual obligations, including Dresdner Bank's obligation to make capital payments on its DresCap Trust Certificates. As a result of the merger, the DresCap Trust Certificates, which are capital-ratio-dependent securities, became consolidated Tier I regulatory capital of the Bank.[10] The Bank's capital now consisted of a heterogeneous

7. LLC Ag. § 7.04(b)(ix).

8. LLC Ag. § 1.01.

9. Support Undertaking § 6.

10. Capital-ratio-dependent securities means that payments were allowed on the securities, *i.e.*, the DresCap Trust Certificates, so long as the Bank maintained the minimum percentage of Tier I regulatory capital required by German regulations, and the Bank was not insolvent or taken over by its German regulator.

mix of profit-dependent securities (such as the Trust Preferred Securities) and capital-ratio-dependent securities (the DresCap Trust Certificates).

## B. The Bank's Post–Merger Capital Payments

After the Dresdner Bank merger, the Bank made payments on its Trust Preferred Securities and the DresCap Trust Certificates in 2009. Thereafter, the Bank encountered serious financial difficulties that required it to seek aid from the German government. As a condition to receiving that aid, the Bank was required to refrain from making any distributions on its profit-dependent securities in 2010 (for fiscal year 2009) and in 2011 (for fiscal year 2010). Accordingly, in November 2009, the Bank announced that it would not make payments on any of its profit-dependent securities (including the Trust Preferred Securities) in 2010, since the Bank did not return a profit for the 2009 fiscal year.

The Bank remained obligated, however, to make payments on its capital-ratio-dependent securities, *i.e.*, the DresCap Trust Certificates. When making those payments, the Bank assumed that the DresCap Trust Certificates were both "Parity Securities" (and "consolidated Tier I regulatory capital") under the LLC Agreement. Accordingly, the Bank represented to German bank regulators and other third parties, both directly and indirectly, that the DresCap Trust Certificates were Parity Securities.[11] By way of example, in response to an investor query, the Bank directly told the investor that the DresCap Trust I Certificates were Parity Securities: "[Y]es, the [DresCap Trust I Certificate] is a hybrid Tier 1 instrument which would qualify as [a] parity instrument."[12]

The Bank later did an about-face, out of concern that its payments on the DresCap Trust Certificates would "push" or trigger payments on the Trust Preferred Securities under the LLC Agreement's "Pusher Provision."[13] To avoid triggering a "push" payment, the Bank proceeded to restructure the DresCap Trust IV Certificates by executing an Amendment Agreement under which the Bank: (1) elevated the DresCap Trust IV Certificates from Tier I to Lower Tier II capital, thereby assigning those Certificates a liquidation preference senior to that of the Trust Preferred Securities; and (2) replaced the Certificates' capital-ratio trigger with a guaranteed automatic payment mechanism.[14] Thereafter, the Bank actively attempted to avoid disclosing to investors

---

11. For example, the Bank, in an e-mail to the European Commission, represented that:

[T]he Commerzbank hybrid structures (Commerzbank Capital Funding Trust I–III and Dresdner Funding Trust I, III and IV) form Hybrid Tier 1 capital .... [and] have been connected by the "Parity Security" definition and the resulting push effect since the two banks merged: i.e. if interest is paid under one structure, this also triggers interest payments for the other Parity Security structures....

The Bank further explained that after the restructuring of the DresCap Trust IV Certificates, those Certificates would be "thus *no longer* a Parity Security, and there [would be] no associated push effect from [that] instru-

ment...." (Italics added). In addition, the Bank separately communicated to its German regulators that the "[c]omplete dissolution of Dresdner Funding Trusts I, III & IV *removes* [the] ... basis for 'parity security pushes'." (Italics added). In those statements, the Bank implicitly admitted that before the restructuring of the DresCap IV Trust Certificates, the Certificates were "Parity Securities."

12. E-mail from Henning Wellmann, Dresdner Bank, to Investor (Nov. 5, 2009).

13. LLC Ag. § 7.04(b)(ix).

14. Amendment Ag. (Feb. 25, 2010).

that it had reclassified the DresCap Trust IV Certificates from Tier I capital to the higher priority category of Lower Tier II capital.[15]

On March 5, 2010, the Bank again announced that it would not make any distributions on the Class B Preferred Securities or the Trust Preferred Securities before the April 12, 2010 Payment Date. In response to that announcement, the Trustee sent the Bank a letter on March 26, 2010, asserting that: (i) the DresCap Trust I and IV Certificates were "Parity Securities" under the LLC Agreement; (ii) under that Agreement's Pusher Provision, the Bank's 2009 and 2010 payments on the DresCap Trust Certificates required ("pushed") a mandatory April 12, 2010 payment on the Class B Preferred Securities and Trust Preferred Securities; and (iii) under the Support Undertaking, the restructuring of the DresCap Trust IV Certificates required an equivalent priority elevation of the Trust Preferred Securities' liquidation preference, from Tier I to Lower Tier II capital.[16]

After the Bank made payments on the DresCap Trust IV Certificates on March 31, 2010, it responded to the Trustee's March 26 letter on April 12, 2010.[17] The Bank took the position that: (i) the DresCap Trust IV Certificates were not Parity Securities; (ii) therefore, the Pusher Provision did not operate to "push" an April 12, 2010 payment on the Class B Preferred

Securities and Trust Preferred Securities; and (iii) the restructuring of the DresCap Trust IV Certificates triggered no obligations under the Support Undertaking.[18]

### C.  Procedural History

On June 18, 2010, the Trustee commenced this Court of Chancery action for declaratory and specific performance relief.  The Trustee requested the court to mandate the Defendants to make a capital payment on the Trust Preferred Securities due and payable on April 12, 2010, and to elevate the priority of those Securities from Tier I to Lower Tier II capital, so as to rank them equally with the restructured DresCap Trust IV Certificates.  The Trustee also sought an award of its costs and expenses, including reasonable attorneys' fees.  In its opening brief in support of its summary judgment motion, the Trustee additionally sought an order mandating the capital payment on the Trust Preferred Securities that would fall due on the April 12, 2011 Payment Date.

■  On February 15, 2011, the parties cross-moved for summary judgment.  In a Memorandum Opinion issued on August 4, 2011, the Court of Chancery deemed the cross-motions as the equivalent of a stipulated request for a determination on the merits.[19]  The court determined that the DresCap Trust Certificates were not Pari-

---

15.  Op. at 12.  For example, the Bank created external communication guidelines that instructed its employees that "statement[s] made to investors ... should ... consciously leave unanswered whether we have taken the initiative to reclassify Hybrid Tier 1 into Lower Tier 2 or whether this originated from [the German regulatory agency]." *Id.* at 13 n. 44. The Bank also failed to announce publicly that the DresCap Trust IV Certificates had been elevated to Lower Tier II capital and instead informed only the German bank regulators of that fact. *Id.* at 13.

16.  Letter from The Bank of New York Mellon, Property Trustee, to Commerzbank *Aktiengesellschaft* (Mar. 26, 2010).

17.  Letter from Commerzbank *Aktiengesellschaft* to The Bank of New York Mellon (Apr. 12, 2010).

18.  *Id.*

19.  Op. at 16.

ty Securities under the LLC Agreement, and as a result concluded that it need not reach the Trustee's remaining claims.[20] On June 13, 2012, the Court of Chancery entered final judgment for the Defendants on count I (declaratory judgment) and count II (specific performance).[21]

This appeal followed.

## ANALYSIS

Three issues are presented on this appeal. The first is whether the DresCap Trust Certificates are "Parity Securities" under the LLC Agreement, which is governed by Delaware law. If those Certificates are found to be "Parity Securities," then two additional issues arise as a consequence. The second issue is whether the payments on the DresCap Trust Certificates in 2009 and 2010 "pushed" or triggered an April 12, 2010 payment on the Trust Preferred Securities under the LLC Agreement. The third issue is whether under the Support Undertaking, the Bank became contractually obligated to elevate the Trust Preferred Securities to a priority rank equal to that of the DresCap Trust IV Certificates. These contentions require this Court to review de novo the Court of Chancery's interpretation of the contracts in dispute.[22]

## I. Whether the DresCap Trust Certificates Are "Parity Securities" Under the LLC Agreement

The threshold issue is whether the DresCap Trust Certificates are "Parity Securities" under the LLC Agreement. The outcome of that dispute turns on the meaning of subsection (ii) of the LLC Agreement's definition of "Parity Securities." Subsection (ii) defines Parity Securities as:

(ii) preference shares or other instruments qualifying as consolidated Tier I regulatory capital of the Bank or any other instrument of any Affiliate of the Bank subject to any guarantee or support agreement of the Bank ranking *pari passu* with the obligations of the Bank under the Support Undertaking. . . . [23]

To better understand the parties' differing interpretations of the quoted definition, the definition is broken down into separate elements represented by bracketed formula language. Thus, the Parity Securities definition may be parsed as follows:

(ii) preference shares ["*Term 1*"] or other instruments ["*Term 2*"] qualifying as consolidated Tier I regulatory capital of the Bank ["*Internal Modifier*"] or any other instrument of any Affiliate of the Bank ["*Term 3*"] subject to any guarantee or support agreement of the Bank

---

**20.** *Id.* at 30. The Court of Chancery later issued a letter opinion on May 31, 2012 that addressed the Trustee's separate claim of quasi-estoppel. *The Bank of New York Mellon v. Commerzbank*, C.A. No. 5580–VCN, 2012 WL 2053299 (Del. Ch. May 31, 2012). The court held that the Trustee had not properly raised the quasi-estoppel claim, and that, in any event, the claim was without merit. *Id.* Although the Trustee appeals from that May 31, 2012 letter opinion ruling in its Notice of Appeal, it does not raise any argument in its opening brief about the quasi-estoppel claim. *The Bank of New York Mellon v. Commerzbank*, No. 372, 2012, D.I. 1 (Not. of Appeal). That claim is therefore waived. *See Americas*

*Mining Corp. v. Theriault*, 51 A.3d 1213, 1264 (Del.2012) (citation omitted); SUPR. CT. R. 14(b)(vi)(A)(3).

**21.** *The Bank of New York Mellon v. Commerzbank*, C.A. No. 5580–VCN, 2012 WL 2154999 (Del. Ch. June 13, 2012). The court did not decide count III (costs and expenses).

**22.** *Gatz Props., LLC v. Auriga Capital Corp.*, 59 A.3d 1206, 1212 (Del.2012); *Arnold v. Soc'y for Sav. Bancorp, Inc.*, 650 A.2d 1270, 1276 (Del.1994).

**23.** LLC Ag. § 1.01.

ranking *pari passu* with the obligations of the Bank under the Support Undertaking ["*Trailing Modifier*"]. . . .

Using these formulaic terms, the Parity Securities definition may be expressed as follows:

[Term 1] *or* [Term 2] + [Internal Modifier] *or* [Term 3] + [Trailing Modifier]. . . .

The Trustee claims that the DresCap Trust Certificates are Parity Securities, because they are "other instruments qualifying as consolidated Tier I regulatory capital of the Bank" (*i.e.*, Term 2 *plus* the Internal Modifier). The Defendants disagree. They argue that the DresCap Trust Certificates cannot be Parity Securities, because to qualify as such, the DresCap Trust Certificates must be "other instruments qualifying as consolidated Tier I regulatory capital of the Bank . . . subject to any guarantee or support agreement of the Bank" (*i.e.*, Term 2 *plus* the Internal Modifier plus the Trailing Modifier). Since the DresCap Trust Certificates were not "subject to any guarantee or support agreement of the Bank" (*i.e.*, the Trailing Modifier), Defendants argue, the Certificates do not fall within the definition of Parity Securities.

The dispute thus turns on whether the definitional phrase "subject to any guarantee or support agreement of the Bank" (*i.e.*, the Trailing Modifier) should be read to modify the preceding phrase "other instruments qualifying as consolidated Tier I regulatory capital of the Bank" (*i.e.*, Term 2 *plus* the Internal Modifier). All parties agree that the DresCap Trust Certificates were not, on a standalone basis, "subject to

any guarantee or support agreement of the Bank" (*i.e.*, the Trailing Modifier). Thus if, as Defendants argue, the Trailing Modifier modifies all the Terms that precede it, then the DresCap Trust Certificates are not Parity Securities.

The Trustee contends that the Trailing Modifier, properly interpreted, modifies only Term 3, but not Term 1 or Term 2. If that construction is correct, then the DresCap Trust Certificates are Parity Securities, because they would be "other instruments qualifying as consolidated Tier I regulatory capital of the Bank" (*i.e.*, Term 2 *plus* the Internal Modifier). The Court of Chancery accepted the Defendants' contrary interpretation, and held that the Trailing Modifier modifies all three preceding Terms.[24] On that basis, the court concluded that the DresCap Trust Certificates are not Parity Securities under the LLC Agreement.[25]

## A. Whether the Parity Securities Definition Is Unambiguous

To decide whether the DresCap Trust Certificates are "Parity Securities," this Court must construe the Parity Securities definition under applicable rules of contract interpretation.[26] That requires us first to decide whether the definition of Parity Securities is unambiguous.[27] The Court of Chancery held that it is.[28] We conclude that it is not.

The Court of Chancery determined that to be a Parity Security, a security must be "subject to any guarantee or support agreement of the Bank" (*i.e.*, the Trailing

24. Op. at 29–30.

25. *Id.*

26. *See PHL Variable Ins. Co. v. Price Dawe*, 28 A.3d 1059, 1070 (Del.2011) (citations omitted).

27. *See id.*

28. Op. at 30 n. 87.

Modifier).[29] Under that construction, the Trailing Modifier would modify all the definitional Terms that precede it. The problem with that construction is that it renders Term 2 of the definition surplusage. Regrettably, the Trustee's alternative interpretation is also flawed, because it too would render a definitional Term—Term 1—surplusage. Where the parties proffer two reasonable (albeit incidentally flawed) interpretations, the Parity Securities definition must be deemed ambiguous.[30]

In concluding that the LLC Agreement's definition of Parity Securities is unambiguous, the Court of Chancery relied upon the definition of Parity Securities in the Trust II Agreement.[31] Both the LLC and the Trust II Agreements, the court noted, were executed on the same day (March 30, 2006).[32] The Trust II Agreement specifically provides that the

word "or" is "not exclusive."[33] Applying the "inclusive or" to the Trust II Agreement definition of Parity Securities, the court reasoned that "the various clauses set off by the word 'or' in section (ii) of the Trust II Agreement's definition of Parity Securities should be considered as a whole, with the whole being modified by the 'subject to' clause that follows it," rather than "as three distinct categories of securities, with only the last being modified by the 'subject to' clause."[34] Applying that reasoning to the separate LLC Agreement, the court held that the Trailing Modifier must be construed to modify all three preceding Terms in the Parity Securities definition of that Agreement.[35] Therefore, to qualify as "Parity Securities," the DresCap Trust Certificates must be "subject to any guarantee or support agreement of the Bank" (*i.e.*, the Trailing Modifier). Because the DresCap Trust Certificates were

---

**29.** *Id.* at 28–29.

**30.** *See Begay v. U.S.*, 553 U.S. 137, 153, 128 S.Ct. 1581, 170 L.Ed.2d 490 (2008) ("[T]he canon against surplusage … helps decide between competing permissible interpretations of an ambiguous statute…."); *PHL Variable Ins. Co.*, 28 A.3d at 1070 (citation omitted) ("A statute is ambiguous if it is susceptible of two reasonable interpretations…."); *Kuhn Const., Inc. v. Diamond State Port Corp.*, 990 A.2d 393, 396–97 (Del. 2010) ("We will read a contract as a whole and we will give each provision and term effect, so as not to render any part of the contract mere surplusage.") (citations omitted). *But cf. Lamie v. U.S. Trustee*, 540 U.S. 526, 536, 124 S.Ct. 1023, 157 L.Ed.2d 1024 (2004) ("Surplusage does not always produce ambiguity and our preference for avoiding surplusage constructions is not absolute.") (citing *Chickasaw Nation v. U.S.*, 534 U.S. 84, 94, 122 S.Ct. 528, 151 L.Ed.2d 474 (2001) (the preference "is sometimes offset by the canon that permits a court to reject words 'as surplusage' if 'inadvertently inserted or if repugnant to the rest of the statute….'")). Here, because it cannot be said that any of the three Terms in the definition on Parity Securities were "inadvertently" inserted into,

or "repugnant" to, that definition, the fact that both the Trustee's and the Defendants' interpretations are reasonable, but nonetheless render a Term surplusage, requires that the Parity Securities definition be deemed ambiguous.

**31.** Op. at 27.

**32.** *Id.* (quoting *Crown Books Corp. v. Bookstop, Inc.*, 1990 WL 26166, at *1 (Del.Ch. Feb. 28, 1990) ("[I]t is appropriate for the court to consider not only the language of that document but also the language of contracts among the same parties executed or amended as of the same date that deal with related matters….")).

**33.** Trust II Ag. § 1.02(b). An "inclusive or," when applied to two terms such as "A or B," means "A or B or both." By contrast, an "exclusive or" means "A or B, but not both." Kenneth A. Adams, *A Manual of Style for Contract Drafting* § 10.30 (2d ed.2008); Bryan A. Garner, *Garner's Dictionary of Legal Usage* 639 (3d ed.2011).

**34.** Op. at 27.

**35.** *Id.*

not subject to any Bank guarantee or support agreement, the court concluded, they were not Parity Securities.[36]

On appeal, the Trustee claims that the Court of Chancery erred, because the Trust II Agreement's definition of "or" as an "inclusive or" is not legally relevant to, let alone dispositive of, a proper construction of the Parity Securities definition in the LLC Agreement. Relevance aside, we agree with the Trustee that the mere presence of an "inclusive or," alone and without more, is not *ipso facto* dispositive of how the contested definition of Parity Securities should be interpreted.

■ The Trustee urges that the term "other instruments" (*i.e.*, Term 2) is more reasonably read as modified by only its immediately following neighbor—the Internal Modifier, "qualifying as consolidated Tier I regulatory capital of the Bank"— and not by the more distant phrase "subject to any guarantee or support agreement of the Bank" (*i.e.*, the Trailing Modifier). The Court of Chancery agreed—as do we—that the Trustee's reading of the Parity Securities definition "does flow somewhat more naturally than the Defendants'." [37] That said, although the "more natural[ ]" reading is a factor to be considered, it does not conclude the analysis. Even a "less natural" reading of a contract

term may be "reasonable" for purposes of an ambiguity inquiry.[38]

It is settled that a contract must be read as a whole and in a manner that will avoid any internal inconsistencies, if possible.[39] To avoid inconsistencies, the Trustee urges, the Trailing Modifier cannot be read to modify Term 2; otherwise, Term 3 would entirely subsume Term 2. Stated differently, all parties agree that a Parity Security is "any other instrument of any Affiliate of the Bank subject to any guarantee or support agreement of the Bank" (*i.e.*, Term 3 *plus* the Trailing Modifier). Given that undisputed premise, the Trustee argues that it would be entirely redundant to define a Parity Security also as an "instrument[ ] qualifying as consolidated Tier I regulatory capital of the Bank ... subject to any guarantee or support agreement of the Bank" (*i.e.*, Term 2 *plus* the Internal Modifier *plus* the Trailing Modifier). That is, under the Defendants' interpretation of the Parity Securities definition (the Trustee argues) Term 2 ("other instruments") would be surplusage.[40]

The Defendants counterargue that the Trustee's interpretation would be similarly flawed, because under the Trustee's construction, Term 1 ("preference shares") would be subsumed by Term 2 ("other instruments"), and thereby rendered surplusage.[41] In that regard the Defendants are correct. The Trustee does not explain

---

36. *Id.* at 29–30.

37. *Id.* at 25.

38. *Rhone–Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992).

39. *See Council of Dorset Condominium Apartments v. Gordon*, 801 A.2d 1, 7 (Del.2002).

40. The Defendants' answer to the Trustee's argument—that the Trustee's argument was not raised in the court below and is therefore waived on appeal—is unavailing, because the Trustee fairly presented and preserved the

issue by arguing below that the Parity Securities definition must be read as a whole.

41. Both sides agree that Term 1 and Term 2 must both be modified by the Internal Modifier, because otherwise Term 1 ("preference shares") in subsection (ii) would subsume the more limited category of "the most senior ranking preference shares of the Bank" in subsection (i) of the Parity Securities definition. Op. at 25. The dispute is over whether both Term 1 and Term 2 are also modified by the Trailing Modifier.

how under its interpretation, the language "preference shares ... qualifying as consolidated Tier I regulatory capital of the Bank" (*i.e.*, Term 1 *plus* the Internal Modifier) would not be swallowed up by the category of "other instruments qualifying as consolidated Tier I regulatory capital of the Bank" (*i.e.*, Term 2 plus the Internal Modifier). The Trustee's interpretation would render Term 1 ("preference shares") surplusage, and the Trustee does not seriously contend otherwise.

■ To summarize, the Defendants' definition of Parity Security may be expressed formulaically as follows:

- [Term 1] + [Internal Modifier] + [Trailing Modifier] *or*
- [Term 2] + [Internal Modifier] + [Trailing Modifier] *or*
- [Term 3] + [Trailing Modifier].

By contrast, the Trustee's definition of Parity Security would be:

- [Term 1] + [Internal Modifier] *or*
- [Term 2] + [Internal Modifier] *or*
- [Term 3] + [Trailing Modifier].

As earlier noted, under each side's reading of the Parity Securities definition, at least one Term—either Term 1 or Term 2—would be rendered surplusage. The fact that both readings would yield a surplusage does not afford a basis to prefer one over the other. Because each side's reading is otherwise reasonable, the Parity Securities definition in the LLC Agreement must be deemed ambiguous.[42]

## B. Interpreting the Ambiguous Parity Securities Definition

■ Where, as here, a contract term is ambiguous, a court normally will consider extrinsic evidence of the parties' contractual intent,[43] which is "not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant." [44] Occasions arise, however—and this is one of them—where it is unhelpful to rely upon extrinsic evidence to determine the parties' intent in drafting the contract.[45]

Here, an inquiry into what the parties intended would serve no useful purpose, because it would yield information about the views and positions of only one side of the dispute—the Bank, the Company, and Trust II. This case does not fit the conventional model of contracts "negotiated" by and among all the interested parties.[46] Here, important parties in interest—the holders of the securities—were neither consulted about, nor involved in the drafting of, the LLC Agreement, the Trust II Agreement, or the Support Undertaking. Therefore, a different interpretive approach is needed—one that will take into account the public securityholders' legitimate contractual interests.[47]

■ That approach implicates the rule of construction, employed in some contract cases, that ambiguities in a contract will be construed against the drafter.[48] A narrower application of that principle requires that a contract which creates rights in public securities investors be in-

**42.** *See supra* note 30.

**43.** *Kaiser Aluminum Corp. v. Matheson,* 681 A.2d 392, 397 (Del.1996).

**44.** *Rhone–Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.,* 616 A.2d 1192, 1195–96 (Del.1992).

**45.** *See Kaiser,* 681 A.2d at 397.

**46.** *See id.*

**47.** *See id.* at 395.

**48.** *Bermel v. Liberty Mut. Fire Ins. Co.,* 56 A.3d 1062, 1070 (Del.2012).

terpreted to give effect to those investors' reasonable expectation.[49] The underlying rationale is that an issuer is "better able to clarify unclear ... contract terms in advance so as to avoid future disputes and therefore should bear the drafting burden that the *contra proferentem* principle would impose upon it."[50] The "reasonable expectation of investors" principle is a specialized application of the *contra proferentem* doctrine.[51] As a general matter we caution against liberal use of the "reasonable expectation of investors" approach as a "short cut" for interpreting ambiguous contractual provisions.[52] In this case, however, that principle is properly applied as a "last resort," because the Defendants could have easily drafted the "hopelessly ambiguous" Parity Securities definition in the LLC Agreement in a straightforward manner.[53] Yet they did not.

■ The reasonable expectation of the public investors—in this case, the holders of the Trust Preferred Securities—must therefore be given effect. The investors' reasonable expectation in this case is that the DresCap Trust Certificates are Parity Securities. That result is hardly novel or surprising, because the Bank itself created that expectation: (i) in various communications with its German regulators, (ii) in its own internal communications, and (iii) with third parties.[54] Particularly telling is that in a November 2009 e-mail exchange, a Bank employee, in response to an investor's inquiry, confirmed that, "[Y]es, the [DresCap Trust I Certificates] is a hybrid Tier 1 instrument which would qualify as a parity instrument."[55] That communication and others like it confirm that of the two competing interpretations, the Trustee's interpretation is the more reasonable, because the Defendants themselves believed—and contributed to the investment community's reasonable belief—that the DresCap Trust Certificates were Parity Securities.

We accordingly construe the Parity Securities definition in the LLC Agreement consistent with the position of the Trustee. Specifically, we conclude that the Trailing Modifier ("subject to any guarantee or support agreement of the Bank") modifies only Term 3 ("any other instrument of any Affiliate of the Bank"), and not Term 1 ("preference shares") or Term 2 ("other instruments") of that definition. We further conclude—and this the parties do not dispute—that the Internal Modifier ("qualifying as consolidated Tier I regulatory capital of the Bank") modifies both Term 1 ("preference shares") and Term 2 ("other instruments"). Here, the DresCap Trust Certificates fall within the category of "other instruments qualifying as consolidated Tier I regulatory capital of the

**49.** *Elliott Assocs., L.P. v. Avatex Corp.*, 715 A.2d 843, 853 (Del.1998); *Kaiser*, 681 A.2d at 398–99.

**50.** *Kaiser*, 681 A.2d at 398–99 (quoting Dale B. Tauke, *Should Bonds Have More Fun? A Reexamination of the Debate Over Corporate Bondholder Rights*, 1989 COLUM. BUS. L.REV. 87, 89 (1989)); *see also Simons v. Cogan*, 542 A.2d 785, 786 (Del.Ch.1987) ("The purchaser ... is offered, and voluntarily accepts, a security whose myriad terms are highly specified.").

**51.** *See Kaiser*, 681 A.2d at 399.

**52.** *Id.*

**53.** *Id.* at 398–99 ("We apply the *contra proferentem* principle here only as a last resort because the language of the certificate presents a hopeless ambiguity, particularly when alternative formulations indicate that these provisions could easily have been made clear.").

**54.** *See supra* note 11.

**55.** E-mail from Henning Wellmann, Dresdner Bank, to Investor (Nov. 5, 2009).

Bank" (*i.e.*, Term 2 *plus* the Internal Modifier). As such, they are Parity Securities under the LLC Agreement. In holding otherwise the Court of Chancery erred.

## II. Whether the "Pusher Provision" Triggered Payments on the Trust Preferred Securities

Our determination that the DresCap Trust Certificates are Parity Securities under the LLC Agreement generates two additional issues, which the Court of Chancery did not reach. In the interest of justice and for the sake of judicial economy,[56] we decide those issues *de novo*.[57]

■ The second issue is whether, under the Pusher Provision of the LLC Agreement, the Bank's 2009 and 2010 payments on the DresCap Trust Certificates triggered ("pushed") a capital payment on the Class B Preferred Securities—which, in turn, would have triggered a capital payment on the Trust Preferred Securities. We hold that they did.

The Pusher Provision states that if the Defendants make any payment on Parity Securities (here, the DresCap Trust Certificates) *"in any Fiscal Year,"* a capital payment on the Class B Preferred Securities "shall be authorized to be declared and paid on the Class B Payment Date falling contemporaneously with or immediately after the date" on which the payment on the Parity Securities was made.[58] If the Defendants make a payment on Parity Secu-

rities, but the Company does not authorize a corresponding capital payment on the Class B Preferred Securities, the capital payment on the Class B Preferred Securities is "deemed" declared and must therefore be paid.[59]

Whether the Pusher Provision operated to trigger ("push") any payments on the Class B Preferred Securities and Trust Preferred Securities turns on what the term "Fiscal Year" in the Pusher Provision means. The dispute is over whether "Fiscal Year" means a calendar year (as the Defendants argue) or a year that runs from April 12 of a given year to April 11 of the following year (as the Trustee contends).

To reiterate the pivotal facts, the Bank made capital payments on the DresCap Trust I Certificates on June 30, 2009 and December 31, 2009. The Bank also made a payment on the DresCap Trust IV Certificates on March 31, 2010. The Bank further caused Trust II to make a sole payment on its own Trust Preferred Securities on April 12, 2009.

The Trustee claims that: (1) the Bank's payments on the DresCap Trust Certificates in 2009 and 2010 triggered a payment on the Trust Preferred Securities that fell due on the April 12, 2010 Payment Date; and (2) the Bank's more recent capital payments on the DresCap Trust Certificates during this litigation triggered a second payment on the Trust Preferred Securities that became due on April 12, 2011.[60] The Defendants respond that no

56. *See E.I. DuPont de Nemours and Co. v. Pressman*, 679 A.2d 436, 444 (Del.1996); *Standard Distrib. Co. v. Nally*, 630 A.2d 640, 647 (Del.1993) (citations and quotations omitted) ("Notwithstanding the Superior Court's failure to rule on the matter, we may dispose of it, in the interests of judicial economy, since the issue was fairly presented to the trial court."); *Sugarland Indus., Inc. v. Thomas*, 420 A.2d 142, 151 & n. 9, 153 (Del.1980); SUPR. CT. R. 8.

57. *Gatz Props., LLC v. Auriga Capital Corp.*, 59 A.3d 1206, 1212 (Del.2012).

58. LLC Ag. § 7.04(b)(ix) (italics added).

59. LLC Ag. § 9.01(b).

60. The Defendants respond that the Trustee's requested relief for an April 12, 2011 capital payment is waived, because the Trustee did not assert a claim for that payment in its

payments on the Trust Preferred Securities were triggered for the April 12, 2010 Payment Date, because the payments on the Trust Preferred Securities and the DresCap Trust Certificates were made in full during the preceding 2009 calendar year.[61] The premise of the Defendants' argument is that "Fiscal Year" means calendar year.

As support for its contrary interpretation—that "Fiscal Year" means April 12 of any year to the following April 11—the Trustee points to analogous language in the Pusher Provision relating to Junior Securities. That analogous language provides that "if only one Junior Distribution was made *in the Class B Payment Period preceding the relevant Class B Payment Date,* Capital Payments shall be authorized to be declared" on the Class B Preferred Securities.[62] Under the LLC Agreement, the "Class B Payment Period" runs from April 12 to the following April 11.[63] Based on the Pusher Provision relating to Junior Securities—which performs the same function as its counterpart that relates to Parity Securities—it is reasonable to interpret "Fiscal Year" (as it re-

lates to Parity Securities) as the April 12 to April 11 Class B Payment Period. Thus, under the Trustee's construction, the Bank's capital payments on the DresCap Trust I and IV Certificates in June and December 2009 and March 2010, "pushed" a capital payment on the Trust Preferred Securities that became due and payable on April 12, 2010.

The Defendants disagree. They urge that under the plain language of the Pusher Provision that applies to Parity Securities, "Fiscal Year" means a calendar year running from January 1 through December 31,[64] as the LLC Agreement defines elsewhere. Under the Defendants' reading, the Bank's 2009 and 2010 payments on the DresCap Trust Certificates (relating to calendar years 2008 and 2009, respectively) did not "push" any payment on the Trust Preferred Securities on April 12, 2010, because that latter payment had already been made for the 2009 Fiscal—*i.e.,* previous calendar—year.

We conclude that the Defendants' interpretation is unreasonable because it conflicts with the plain language of the specif-

---

verified complaint. The Trustee did assert a claim for that payment in its opening summary judgment brief in the Court of Chancery. The Trustee also raised the issue in its opening brief on this appeal. An argument properly raised in a party's opening brief is not considered waived. *Cf. Americas Mining Corp. v. Theriault,* 51 A.3d 1213, 1264 (Del. 2012) ("The merits of any argument that is not raised in the body of the opening brief shall be deemed waived ....") (quoting Supr. Ct. R. 14(b)(vi)(A)(3)). The Trustee therefore properly raised in the Court of Chancery, and preserved in this Court, its requested relief for an April 12, 2011 capital payment on the Class B Preferred Securities (and, in turn, the Trust Preferred Securities).

**61.** The Defendants also argue that the Trustee's definition of a Fiscal Year (from April 12 of a given year to April 11 of the following year) would trigger a "domino theory" of

pusher payments, whereby payments on the DresCap Trust Certificates in one year would trigger payments on the Trust Preferred Securities on April 12 of the next year that would, in turn, trigger payments on other securities in that second year. The Trustee argues, and we agree, that the Defendants' "domino theory" of pusher payments is not a foregone conclusion and could be terminated at various points in the allegedly indefinite payment stream in different ways. In any event, the Defendants are bound to the terms of the LLC Agreement that they drafted. We afford no weight to the Defendants' "domino theory" claim.

**62.** LLC Ag. § 7.04(b)(ix)(A)(bb) (italics added).

**63.** LLC Ag. §§ 1.01, 7.04(b)(i).

**64.** LLC Ag. § 1.01.

ic Pusher Provision at issue here. Under the Defendants' interpretation, if an April 12, 2009 payment on the Trust Preferred Securities is made *before* the June 30, 2009 payment on the DresCap Trust Certificates (but within the same calendar year), the Pusher Provision would be triggered. That Provision's plain language, however, requires that the triggered April 12, 2009 payment must fall *"contemporaneously with or immediately after"* the June 30, 2009 payment date.[65] In this specific context, the Defendants' construction of "Fiscal Year" would lead to an illogical sequence of events squarely at odds with the Pusher Provision's requirements. An interpretation that conflicts with the plain language of a contract is not reasonable.[66]

Because the Defendants' interpretation—equating "Fiscal Year" with a calendar year—is unreasonable, it must be rejected. The Trustee's interpretation, which is consistent with the plain language of the LLC Agreement, is the only reasonable alternative. We therefore conclude that, within the context of the Pusher Provision of the LLC Agreement, "Fiscal Year" means April 12 of a given year to April 11 of the following year.

In this case, because the Bank made payments on the DresCap Trust Certificates on June 30, 2009, December 31, 2009, and March 31, 2010, those payments "pushed" payments on the Class B Preferred Securities—which, in turn, pushed payments on the Trust Preferred Securities—that fell due on April 12, 2010. And

because the Trustee properly requested the Court of Chancery to order a payment on the Class B Preferred Securities (and Trust Preferred Securities) falling due on April 12, 2011, we further conclude, by parity of reasoning, that the Defendants are also contractually obligated to make that payment.

## III. Whether the Bank Violated the Support Undertaking

■ Our determination that the Dres-Cap Trust Certificates are Parity Securities under the LLC Agreement generates the third and final issue: whether the Bank was contractually obligated to elevate the Trust Preferred Securities to rank equal to the DresCap Trust IV Certificates under the Support Undertaking. We hold that the Bank was so obligated.

Section 6 of the Support Undertaking pertinently provides that the Bank "shall not give any guarantee or similar undertaking with respect to, or enter into any other agreement relating to the support or payment of" Parity Securities, "unless the parties hereto modify this Agreement such that the Bank's obligations under this Agreement rank at least *pari passu* with, and contain substantially equivalent rights of priority as to payment as" the Parity Securities. To determine whether the Bank violated the Support Undertaking, we must decide whether the Bank, by restructuring the DresCap Trust IV Certificates, "enter[ed] into [an] agreement relating to the support or payment of" the

---

65. *See QVT Fund LP v. Eurohypo Capital Funding LLC I*, 2011 WL 2672092, at *12–13 (Del.Ch. July 8, 2011) (discussing how, under the Defendants' interpretation of a virtually-identical Pusher Provision, a payment on a Parity Security in June would trigger an *earlier* payment in March of that same year, even though the Pusher Provision's plain language mandated that the triggered payment in March must be made "contemporaneously

with or immediately after" the June payment) (italics added).

66. *See PHL Variable Ins. Co. v. Price Dawe*, 28 A.3d 1059, 1070 (Del.2011) (citations and quotations omitted) ("If [a contract] is unambiguous, then there is no room for judicial interpretation and the plain meaning ... controls.").

DresCap Trust Certificates.[67] We hold that the Bank did.

In restructuring the DresCap Trust IV Certificates, the Bank entered into an Amendment Agreement that enabled it to assign those Certificates a senior liquidation preference, by elevating them from the lower priority Tier I class of capital to the higher priority category of Lower Tier II capital. The restructuring also enabled the Bank to replace the DresCap Trust IV Certificates' capital-ratio trigger with a guaranteed automatic payment mechanism. By virtue of the Amendment Agreement and the Bank's restructuring of the DresCap Trust IV Certificates thereunder, the Bank "enter[ed] into [an] agreement relating to the support or payment of" the DresCap Trust Certificates. That triggered the Support Undertaking.

Although the Amendment Agreement clearly "relat[ed] to the support or payment" of the DresCap Trust Certificates, the Defendants did not modify the Support Undertaking to reflect the changes effected by that Agreement. The Trustee contends that Section 6 of the Support Undertaking explicitly prohibits the Bank from entering into the Amendment Agreement "unless the parties hereto modify [the Support Undertaking]."

The Defendants read the Support Undertaking differently. They argue that to trigger the Support Undertaking, the Bank must *first* amend Section 2 of that Undertaking to provide a guarantee that ranks *pari passu* with an "agreement relating to the support or payment of" a Parity Security. Because the Bank never took that first step of amending Section 2, the argument goes, the Bank could not have taken the second step under Section 6 of "enter[ing] into [an] agreement relating to the support or payment of" the DresCap Trust Certificates. Therefore (the Bank concludes), the Amendment Agreement that restructured the DresCap Trust IV Certificates was not an "agreement relating to the support or payment of" those Certificates.

That convoluted argument ignores the facts, and turns the language of the Support Undertaking on its head. The Bank cannot be heard to claim that it never entered into an "agreement relating to the support or payment of" the DresCap Trust Certificates because it unilaterally decided not to satisfy Section 6's condition requiring the Bank to amend the Support Undertaking. To allow the Bank to defeat its contractual obligation in this way would defeat the purpose of the Support Undertaking and gut the protections afforded by it.

The Bank entered into an agreement that, *in fact*, related to the support or payment of the DresCap Trust Certificates. It must, therefore, be presumed *in law* that the Bank satisfied its prerequisite contractual obligation to modify the Support Undertaking accordingly. That construction is consistent with the maxim that "equity regards that as done which ought to be done."[68] It is also consistent with the Bank's admission, in its answering brief, that under "[t]he Support Undertaking ... if the Bank provides a senior ranking guarantee to any Parity Security or Junior Security, it *must amend* the Support Undertaking to match the priority of the guarantee in the Support Undertaking to the Bank's guarantee to the Parity or Junior Security."[69]

---

**67.** Support Undertaking § 6.

**68.** *See Monroe Park v. Metropolitan Life Ins. Co.,* 457 A.2d 734, 737 (Del.1983) (citation omitted).

**69.** Italics added.

When it restructured the DresCap Trust IV Certificates, the Bank failed to perform its prerequisite obligation to modify the Support Undertaking so as to elevate the Trust Preferred Securities to "rank at least *pari passu* with, and contain substantially equivalent rights of priority as to payment as" the DresCap Trust IV Certificates. Therefore, the Bank "must amend" the Support Undertaking to elevate the Trust Preferred Securities to rank equal to the DresCap Trust IV Certificates.

Lastly, we address the remedy. The Trustee claims that specific performance is required, because under German law, specific performance is the general remedy for a violation of the Support Undertaking.[70] The Trustee contends that any order for specific performance should require the Bank: (i) to elevate the Trust Preferred Securities to the same Lower Tier II capital class as the restructured DresCap Trust IV Certificates, (ii) to modify the Trust Preferred Securities to give them the same senior liquidation preference as the DresCap Trust IV Certificates, and (iii) to maintain the Trust Preferred Securities' accrual of capital payments at the contractually fixed rate of 5.905% per year.[71]

The Trustee's proposed remedies are consistent with the Support Undertaking, because they will ensure that the Trust Preferred Securities "rank at least *pari passu* with, and contain substantially equivalent rights of priority as to payment" as the DresCap Trust IV Certificates. Accordingly, we hold that the Trustee's proposed remedies are appropriate, and that on remand the Court of Chancery shall order the Defendants to specifically perform those terms, as the Support Undertaking and German law require.

### *CONCLUSION*

For the foregoing reasons, the judgment of the Court of Chancery is reversed, and the case is remanded, with instructions to the Court of Chancery to enter final judgment for the Trustee on count I (declaratory judgment) and count II (specific performance), consistent with the rulings in this Opinion. Jurisdiction is not retained.

---

70. Support Undertaking § 13; Clemens Kochinke, *Business Laws of Germany* § 18:13 (2012) ("Under German law, strict performance is expected and can be enforced. What is known in common-law countries as the equitable exception of specific performance constitutes the rule in German law.... Substantial performance is simply not good enough.").

71. LLC Ag. § 7.04(b)(i). The Defendants do not address the remedy issue.