**COURT OF CHANCERY**
**OF THE**
**STATE OF DELAWARE**

JOSEPH R. SLIGHTS III
VICE CHANCELLOR

417 S. State Street
Dover, Delaware 19901
Telephone: (302) 739-4397
Facsimile: (302) 739-6179

Date Submitted: February 21, 2017
Date Decided: May 17, 2017

Stephen P. Lamb, Esquire
Meghan M. Dougherty, Esquire
Paul, Weiss, Rifkind, Wharton
    & Garrison LLP
500 Delaware Avenue, Suite 200
Wilmington, DE 19801

Kevin G. Abrams, Esquire
J. Peter Shindel, Jr., Esquire
Abrams & Bayliss LLP
20 Montchanin Road, Suite 200
Wilmington, DE 19807

Thad J. Bracegirdle, Esquire
Wilks, Lukoff & Bracegirdle, LLC
4250 Lancaster Pike, Suite 200
Wilmington, DE 19805

Joel Friedlander, Esquire
Friedlander & Gorris, P.A.
1201 N. Market Street, Suite 2200
Wilmington, DE 19801

Re:    *AM General Holdings LLC v. The Renco Group, Inc.*;
       C.A. No. 7639-VCS
       *The Renco Group, Inc. v. MacAndrews AMG Holdings LLC*
       C.A. No. 7668-VCS

Dear Counsel:

The parties have filed cross-motions for partial summary judgment on two counts (Count I for Breach of Contract and Count VII for Declaratory Judgment) of the Verified Second Amended Complaint (the "Complaint"). This decision

*AM General Holdings LLC v. The Renco Group, Inc.*
   C.A. No. 7639-VCS
*The Renco Group, Inc. v. MacAndrews AMG Holdings LLC*
   C.A. No. 7668-VCS
May 17, 2017
Page 2

represents the latest chapter in protracted litigation between the parties as they battle

over the distribution of profits from their joint venture.[1]  Specifically, Plaintiff, The

Renco Group, Inc. ("Renco"), alleges that Defendant, MacAndrews AMG Holdings

LLC ("MacAndrews AMG"), used its control over AM General Holdings LLC

("Holdco" or the "Company") as managing member to cause Holdco to distribute

$72.8 million to MacAndrews AMG that should have gone to Renco.  It is alleged

that this wrongful distribution of funds out of the joint venture was in breach of the

---

[1] As I have previously noted, the parties have litigated with remarkable intensity.  Readers interested in a more detailed description of the background facts can refer to any of a number of written decisions by this court.  *See, e.g.*, *AM Gen. Hldgs. LLC v. The Renco Gp., Inc.*, 2016 WL 4440476 (Del. Ch. Aug. 22, 2016);  *AM Gen. Hldgs. LLC v. The Renco Gp., Inc.*, 2015 WL 3465956 (Del. Ch. May 29, 2015); *AM Gen. Hldgs. LLC v. The Renco Gp., Inc.*, 2015 WL 1726418 (Del Ch. Apr. 9, 2015); *The Renco Gp., Inc. v. MacAndrews AMG Hldgs. LLC*, 2015 WL 394011 (Del. Ch. Jan. 29, 2015); *AM Gen. Hldgs. LLC v. The Renco Gp., Inc.*, 2014 WL 6734250 (Del. Ch. Nov. 28, 2014); *AM Gen. Hldgs. LLC v. The Renco Gp., Inc.*, 2013 WL 5863010 (Del. Ch. Oct. 31, 2013); *The Renco Gp., Inc. v. MacAndrews AMG Hldgs. LLC*, 2013 WL 3369318 (Del. Ch. June 25, 2013); *AM Gen. Hldgs. LLC v. The Renco Gp. Inc.*, 2013 WL 1668627 (Del. Ch. Apr. 18, 2013); *AM Gen. Hldgs. LLC v. The Renco Gp., Inc.*, 2012 WL 6681994 (Del. Ch. Dec. 21, 2012).

*AM General Holdings LLC v. The Renco Group, Inc.*
   C.A. No. 7639-VCS
*The Renco Group, Inc. v. MacAndrews AMG Holdings LLC*
   C.A. No. 7668-VCS
May 17, 2017
Page 3

Limited Liability Agreement of AM General Holdings LLC dated August 10, 2004, that governs the parties' relationship (the "Holdco Agreement").

The Holdco Agreement, *inter alia,* sets forth a complex scheme by which the parties agreed that profits and losses of the joint venture should be allocated to each member. The cross-motions for summary judgment identify several provisions of the Holdco Agreement that create and implement this allocation scheme. Both parties agree that the relevant provisions are clear and unambiguous and that a proper construction of the provisions will allow the Court to adjudicate this dispute as a matter of law. Of course, that is where the agreement ends. The parties disagree on what the language says and what it means.

Our law is settled that "[a] contract is not rendered ambiguous simply because the parties do not agree upon its proper construction."[2] Rather, the court will deem contractual language ambiguous only if the language is "reasonably or fairly

---

[2] *Rhone-Poulenc Basic Chem. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992).

*AM General Holdings LLC v. The Renco Group, Inc.*
   C.A. No. 7639-VCS
*The Renco Group, Inc. v. MacAndrews AMG Holdings LLC*
   C.A. No. 7668-VCS
May 17, 2017
Page 4

susceptible of different interpretations."[3]   After carefully reviewing the provisions of the Holdco Agreement at issue here, and the parties' competing constructions of those provisions, I am satisfied that both parties have interpreted the contract reasonably.   Consequently, the cross-motions for summary judgment must be denied.

### A. Summary Judgment Standard

"There is no 'right' to a summary judgment."[4]   Summary judgment is only appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."[5]  "When the issue before the Court involves the interpretation of a contract, summary judgment is appropriate only if the contract in question is unambiguous."[6]  In the procedural context of cross-

---

[3] *Id.*

[4] *Telxon Corp. v. Meyerson*, 802 A.2d 257, 262 (Del. 2002).

[5] Ct. Ch. R. 56(c).

[6] *United Rentals, Inc. v. RAM Hldgs., Inc.*, 937 A.2d 810, 830 (Del. Ch. 2007).

*AM General Holdings LLC v. The Renco Group, Inc.*
  C.A. No. 7639-VCS
*The Renco Group, Inc. v. MacAndrews AMG Holdings LLC*
  C.A. No. 7668-VCS
May 17, 2017
Page 5

motions for summary judgment, in order to prevail, one of the parties "must establish that [its] construction is the *only* reasonable interpretation."[7]  If both parties offer arguably reasonable constructions, even if one might appear more reasonable than the other, the Court "may, in its discretion, deny summary judgment [so that it may] . . . inquire into or develop more thoroughly the facts at trial in order to clarify the law or its application."[8]

### B. The Dispute Over Distributions

The gravamen of the dispute is whether $72.8 million MacAndrews AMG distributed to itself in December 2012 and February 2013 should be awarded to

---

[7] *Id.* (emphasis in original).

[8] *In re Comverge, Inc. S'holders Litig.*, C.A. No. 7368-VCMR (Del. Ch. Oct. 31, 2016) (ORDER) (citing *Alexander Indus., Inc. v. Hill*, 211 A.2d 917 (Del. 1965)).  Even if the Court determines that one party's reading of the contract is more reasonable or "natural," that does not preclude a finding of ambiguity.  *Bank of New York Mellon v. Commerzbank Capital Funding Trust II*, 65 A.3d 539, 550 (Del. 2013) ("[A]lthough the 'more natural[]' reading is a factor to be considered, it does not conclude the analysis.  Even a 'less natural' reading of a contract term may be 'reasonable' for purposes of an ambiguity inquiry.") (citing *Rhone-Poulenc*, 616 A.2d at 1196).

*AM General Holdings LLC v. The Renco Group, Inc.*
  C.A. No. 7639-VCS
*The Renco Group, Inc. v. MacAndrews AMG Holdings LLC*
  C.A. No. 7668-VCS
May 17, 2017
Page 6

Renco in order to restore compliance with the parties' bargained-for balance with respect to their capital interests in the joint venture. Prior to the distributions at issue, MacAndrews AMG valued Holdco at a fair market value of between $1.489 and $1.759 billion. MacAndrews AMG attributed approximately $1.164 to $1.434 billion of that value to the equity value of AM General.[9] When Renco disagreed with that valuation, the parties initiated the appraisal procedure detailed in the Holdco Agreement. At the conclusion of that procedure, an independent appraiser determined that Holdco had a fair market value of $314 million and that AM General had an equity value of $27.5 million. Renco argues that MacAndrews AMG used its inflated valuation to justify the distributions it received and that, based on the new valuation, the equity value of AM General was well below a value that would trigger any right MacAndrews AMG may have had to receive a distribution.

---

[9] AM General is the Delaware limited liability company owned by Holdco. The balance of the fair market value of Holdco is attributable to its membership interest in Ilshar Capital LLC ("Ilshar"). Holdco's membership interest in Ilshar entitles Holdco to receive a cumulative compounded preferred return of 8.25% per annum from Ilshar as well as 10% of Ilshar's profits in excess of the preferred return.

*AM General Holdings LLC v. The Renco Group, Inc.*
  C.A. No. 7639-VCS
*The Renco Group, Inc. v. MacAndrews AMG Holdings LLC*
  C.A. No. 7668-VCS
May 17, 2017
Page 7

According to Renco, the revised valuation threw the parties' capital accounts out of balance. To remedy that imbalance, Renco seeks to invoke a series of provisions in the Holdco Agreement that it contends allow it to elect to receive distributions from Holdco (wrongfully taken by MacAndrews AMG) in order to restore the capital accounts to the bargained-for levels.

## C. The Relevant Provisions of the Holdco Agreement

Several provisions of the Holdco Agreement address the parties' agreement with respect to the maintenance of their capital accounts and the allocation of profits and other amounts to the joint venturers. They are summarized below in the order they appear in the Holdco Agreement.

Section 4.4 sets forth the definition of Revalued Capital Accounts ("RCA"), a term that appears as a defined term in other relevant provisions. It states:

> The Revalued Capital Account of each Member shall be the Capital Account balance such Member would have if all of the assets of [Holdco] were sold for their respective gross fair market values . . . and the resulting Profits, Losses and all other items of income, gain, loss

*AM General Holdings LLC v. The Renco Group, Inc.*
  C.A. No. 7639-VCS
*The Renco Group, Inc. v. MacAndrews AMG Holdings LLC*
  C.A. No. 7668-VCS
May 17, 2017
Page 8

and deduction were allocated to the Members pursuant to <u>Sections 8.1</u>, <u>8.2</u>, <u>8.3</u> and <u>8.4</u>.[10]

Section 8.3 is entitled <u>Limitation on Allocations</u>.  Section 8.3(a) reads, in

relevant part:

> Except as provided in <u>Section 8.4</u>, no allocation of Profits or other items of income or gain shall be made to Renco or any of its Affiliates or Losses or items of loss, deduction or expense shall be made to [MacAndrews AMG] or any of its Affiliates during any Fiscal Year, to the extent such allocation . . . would cause Renco and its Affiliates to either: (i) have an aggregate Revalued Capital Account equal to or greater than 80% of the aggregate Revalued Capital Accounts of all Members (the "<u>Renco 80% Capital Account Cap</u>"); or receive an aggregate allocation equal to or greater than 80% of the Profits and other items of income and gain of the Company for the current Fiscal Year (the "<u>Renco 80% Profits Cap</u>" and together with the Renco 80% Capital Account Cap, the "<u>Renco 80% Cap</u>") . . . . [a]ny Profits and other items of income and gain not allocated to Renco or its Affiliates or Losses or items of Loss, deduction or expense not allocated to [MacAndrews AMG] pursuant to the operation of the Renco 80% Cap shall be reallocated to all the other Capital Members in proportion to their respective Capital Accounts.[11]

---

[10] Transmittal Aff. of J. Peter Shindel, Jr. Esq. in Supp. of the Renco Gp., Inc.'s Memorandum of Law in Supp. of its Mot. for Partial Summ. J. Ex. A ("Holdco Agreement") § 4.4.

[11] Holdco Agreement § 8.3(a).

*AM General Holdings LLC v. The Renco Group, Inc.*
  C.A. No. 7639-VCS
*The Renco Group, Inc. v. MacAndrews AMG Holdings LLC*
  C.A. No. 7668-VCS
May 17, 2017
Page 9

Section 8.3(b) provides:

> At the election of Renco, the Managing Member shall cause AM General and its Subsidiaries to distribute any AM General Available Cash to the Company and the Company shall distribute any Cash Available for Distribution to Renco to reduce or eliminate the excess of Renco and its Affiliates' aggregate Revalued Capital Account over the Renco 80% Capital Account Cap or to permit Renco to be allocated Profits to reverse prior Losses specially allocated to Renco or any of its Affiliates and in respect of prior Profits specially allocated away from Renco or any of its Affiliates under this <u>Section 8.3</u> but in no event exceeding the Renco 80% Profits Cap (the "<u>Renco 80% Cap Distribution</u>").[12]

Finally, Section 9.4(c) provides for restrictions on distributions to

MacAndrews AMG:

> The Company shall not make any distributions to [MacAndrews AMG], (i) if [MacAndrews AMG] so elects or (ii) if it would cause [MacAndrews AMG's] Revalued Capital Account to be equal or less than 20% of the aggregate Revalued Capital Accounts of all Members in the Company. The Company shall notify [MacAndrews AMG] of its intent to make a distribution pursuant to Section 9.1 at least five days prior to such distribution. The Company shall not make such distribution to [MacAndrews AMG] unless [MacAndrews AMG]

---

[12] Holdco Agreement § 8.3(b).

*AM General Holdings LLC v. The Renco Group, Inc.*
   C.A. No. 7639-VCS
*The Renco Group, Inc. v. MacAndrews AMG Holdings LLC*
   C.A. No. 7668-VCS
May 17, 2017
Page 10

notifies the Company of its determination that the Company may make such distribution pursuant to this Section 9.4(c).[13]

### D. The Parties' Reasonable Competing Constructions

The parties have offered competing constructions of the relevant provisions in support of their respective applications that the Court declare as a matter of law that the distribution of profits from Holdco to MacAndrews AMG either did or did not breach the Holdco Agreement. Both are reasonable.

Renco's view of the interaction of these provisions begins with the prohibition expressed in Section 9.4(c) that "[Holdco] shall not make any distributions to [MacAndrews AMG] . . . if it would cause [MacAndrews AMG's] Revalued Capital Accounts to be equal to or less than 20% of the aggregate Revalued Capital Accounts of all Members in [Holdco]." Renco then moves to Section 8.3(b), which provides that Renco can elect to cause Holdco to make a distribution to Renco in order to reduce or eliminate any excess in Renco and its Affiliates' aggregate Revalued Capital Account over the Renco 80% Capital Account Cap as defined in

---

[13] Holdco Agreement § 9.4(c).

*AM General Holdings LLC v. The Renco Group, Inc.*
  C.A. No. 7639-VCS
*The Renco Group, Inc. v. MacAndrews AMG Holdings LLC*
  C.A. No. 7668-VCS
May 17, 2017
Page 11

Section 8.3(a). Renco maintains that nothing in Section 8.3 suggests that the parties intended that Section 8.3(b) would apply only after the allocations contemplated by Section 8.3(a) had occurred. Rather, Sections 8.3(a) and 8.3(b) offer two alternatives to achieve the same end—ensuring that Renco's capital account stays below the Renco 80% Capital Account Cap and that MacAndrews AMG does not receive distributions if such distributions "would cause [MacAndrews AMG's] Revalued Capital Accounts to be equal to or less than 20% of the aggregate Revalued Capital Accounts of all Members in [Holdco]."[14]

Renco contends that the recent valuation of Holdco reveals that MacAndrews AMG's Revalued Capital Account was below 20% of the Members' aggregate Revalued Capital Accounts before MacAndrews AMG caused Holdco to make distributions to MacAndrews AMG.[15] Therefore, applying its construction of

---

[14] Holdco Agreement § 9.4(c).

[15] Under Section 4.4 of the Holdco Agreement, MacAndrews AMG, as the Managing Member, has the right to make an initial determination of the RCAs. Renco, however, maintains the right to invoke the appraisal procedure set forth in Section 15.12 if it disagrees with MacAndrews AMG's initial determination. MacAndrews AMG is then responsible for engaging an appraiser to perform an appraisal of the assets of Holdco, a

*AM General Holdings LLC v. The Renco Group, Inc.*
   C.A. No. 7639-VCS
*The Renco Group, Inc. v. MacAndrews AMG Holdings LLC*
   C.A. No. 7668-VCS
May 17, 2017
Page 12

Section 9.4(c) and Sections 8.3(a) & (b), Renco maintains that MacAndrews AMG was prohibited from receiving any distribution and, instead, Renco was entitled to elect to receive the distribution in order to bring its balance beneath the Renco 80% Capital Account Cap.

Renco's proffered construction is reasonable. It gives meaning to the language in Section 9.4(c) that would appear to prohibit MacAndrews AMG from receiving distributions when its RCA balance is below 20% (or when the distribution

---

critical input for the calculation of the RCAs. If Renco disagrees with this initial appraisal value, it has a right, after providing written notice of its disagreement, to engage its own appraiser in order to perform an alternate appraisal. If MacAndrews AMG disagrees with the results of the alternate appraisal, then the parties are to select a third appraiser. The parties initiated this process, disagreed with each other's appraisals and then could not agree on the third appraiser. The Court intervened and appointed Valuation Research Corporation ("VRC") as the third appraiser. VRC issued a report dated June 22, 2016. The parties disagree about the effect of that appraisal. Renco argues that, because VRC arrived at a valuation of Holdco that was significantly lower than MacAndrews AMG's original valuation, Renco's RCA is above the Renco 80% Capital Account Cap and, therefore, pursuant to Sections 9.4(c) and 8.4(b), the distribution of $72.8 million should have gone to Renco to lower its RCA. MacAndrews AMG counters that the results of the third appraisal are but one input when calculating the RCAs, that the results of the third appraisal do not change the manner in which the contractual provisions operate, that its revised calculation of the RCAs was proper and, therefore, that the distributions to MacAndrews AMG were also proper.

*AM General Holdings LLC v. The Renco Group, Inc.*
  C.A. No. 7639-VCS
*The Renco Group, Inc. v. MacAndrews AMG Holdings LLC*
  C.A. No. 7668-VCS
May 17, 2017
Page 13

would cause its RCA balance to drop below 20%) in violation of the Renco 80% Capital Account Cap.  Renco also reasonably construes Section 8.3(b) as an option to remedy any imbalance in the parties' capital accounts to restore the agreed-upon limits.  As Renco argues, the terms of Section 8.3 do not clearly state that Section 8.3(a) must always be applied prior to Renco exercising its right to elect to receive a distribution under Section 8.3(b).  In other words, Section 8.3 can reasonably be construed as providing Renco with the option to elect to receive a distribution in order to re-align the RCA balances.

Having determined that Renco's proffered construction is reasonable, however, does not end the inquiry.  Renco's construction cannot prevail on summary judgment if MacAndrews AMG's construction of the same provisions is also reasonable.  For the reasons that follow, I am satisfied that it is.

MacAndrews AMG's view of the allocation scheme flows from its reading of Sections 4.4 and 8.3(a).  Under Section 4.4, the RCA of each Member is defined as "the Capital Account balance such Member would have if all of the assets of [Holdco] were sold for their respective gross fair market values . . . and the resulting

*AM General Holdings LLC v. The Renco Group, Inc.*
   C.A. No. 7639-VCS
*The Renco Group, Inc. v. MacAndrews AMG Holdings LLC*
   C.A. No. 7668-VCS
May 17, 2017
Page 14

Profits, Losses and all other items of income, gain, loss and deduction were allocated to the Members pursuant to Sections 8.1, 8.2, 8.3 and 8.4." MacAndrews AMG points out that the value "of the assets of Holdco . . . [if] sold for their respective gross fair market values" was revealed by the recent appraisal process. Using this value, MacAndrews AMG argues that the hypothetical gains and losses from a sale of those assets must be "allocated to the Members pursuant to Sections 8.1, 8.2, 8.3 and 8.4" in order to determine each Member's RCA. According to MacAndrews AMG, the reallocations required by Section 8.3(a) are mandatory. Therefore, any losses that would result from a hypothetical sale of the Company, as contemplated by Section 4.4, must be allocated away from MacAndrews AMG under Section 8.3(a) for the very purpose of preventing Renco's RCA balance from hitting the 80% Renco Capital Account Cap.

Under MacAndrews AMG's construction, the prohibition in Section 9.4(c) against certain distributions, upon which Renco so heavily relies, is actually intended to allow MacAndrews AMG to prevent distributions that would cause its RCA to drop below 20%. By preventing its own RCA from dipping below 20%,

*AM General Holdings LLC v. The Renco Group, Inc.*
  C.A. No. 7639-VCS
*The Renco Group, Inc. v. MacAndrews AMG Holdings LLC*
  C.A. No. 7668-VCS
May 17, 2017
Page 15

MacAndrews AMG is also able to prevent Renco's RCA from going above 80% and thereby prevent a breach of the Renco 80% Capital Account Cap. This construction does not render Renco's right to receive distributions under Section 8.3(b) superfluous because that provision exists to remedy imbalances in the Members' *actual* capital account balances that cannot be remedied by the reallocations of losses pursuant to Section 8.3(a).

MacAndrews AMG's proffered construction is reasonable. Section 4.4 requires the managing member, MacAndrews AMG, to determine the Members' RCA balances by applying Sections 8.1, 8.2, 8.3 and 8.4. Section 8.3(a) states that in calculating the balances, hypothetical losses are to be allocated away from MacAndrews AMG to Renco. This provision reasonably can be read to require the managing member to apply the allocation limits of Section 8.3(a) before determining whether Renco is entitled to receive any distributions. For its part, Section 9.4(c) is clearly meant to prevent distribution to MacAndrews AMG in certain circumstances, but it is reasonable to construe the language in Section 8.3 as requiring the reallocation of losses prior to Renco being entitled to take any distributions. In other

*AM General Holdings LLC v. The Renco Group, Inc.*
   C.A. No. 7639-VCS
*The Renco Group, Inc. v. MacAndrews AMG Holdings LLC*
   C.A. No. 7668-VCS
May 17, 2017
Page 16

words, even if Section 9.4(c) applies, it is not clear that Renco has the immediate right to elect to receive a distribution under Section 8.3(b) prior to the managing member applying the allocation limitations in Section 8.3(a).

Because the applicable provisions of the Holdco Agreement are "reasonably or fairly susceptible of different interpretations or may have two or more different meanings," the contract is ambiguous.[16] "[W]hen there is uncertainty in the meaning and application of contract language, the reviewing court must consider the evidence offered in order to arrive at a proper interpretation of contractual terms."[17] The Court's construction of the Holdco Agreement must await the presentation of extrinsic evidence that hopefully will provide insight regarding the parties' intent.

---

[16] *Rhone-Poulenc*, 616 A.2d at 1196.

[17] *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232–33 (Del. 1997) (noting that extrinsic evidence used to construe ambiguous contractual provisions may include "evidence of prior arrangements and communications of the parties as well as trade usage or course of dealing.").

*AM General Holdings LLC v. The Renco Group, Inc.*
   C.A. No. 7639-VCS
*The Renco Group, Inc. v. MacAndrews AMG Holdings LLC*
   C.A. No. 7668-VCS
May 17, 2017
Page 17

**E. The Court Cannot Invoke the "Stipulation" Provision in Court of Chancery Rule 56(h)**

Under Court of Chancery Rule 56(h), "[w]here the parties have filed cross motions for summary judgment and have not presented argument to the Court that there is an issue of fact material to the disposition of either motion, the Court shall deem the motions to be the equivalent of a stipulation for decision on the merits based on the record submitted with the motions." At the end of the hearing on the cross-motions, I asked the parties to consider and then advise me whether they believed I should treat the cross-motions as a stipulation for a decision on the merits based on the record submitted even if I concluded that the relevant provisions of the Holdco Agreement were ambiguous. Suffice it to say, the parties did not agree. Having studied the record submitted, I am satisfied that it is inadequate to allow the Court to discern the parties' intent under the Holdco Agreement with respect to the distributions at issue. While "the filing of cross-motions will often trigger Court of

*AM General Holdings LLC v. The Renco Group, Inc.*
  C.A. No. 7639-VCS
*The Renco Group, Inc. v. MacAndrews AMG Holdings LLC*
  C.A. No. 7668-VCS
May 17, 2017
Page 18

Chancery Rule 56(h),"[18] that is not always the case.[19] "Given the complex legal and factual issues that remain unresolved, this case is a clear instance where the court should inquire more thoroughly into the facts in order to clarify the application of law to the circumstances."[20]

The cross-motions for summary judgment are denied without prejudice. The parties shall submit a case scheduling order that conforms to the direction set forth in the Court's letter to counsel dated May 2, 2017, so that appropriate discovery of extrinsic evidence may commence. The parties should also consider whether it is appropriate to invoke the "stipulation" provision of Court of Chancery Rule 56(h) after the record is further developed with respect to the contract construction issues addressed here. The Court will entertain renewed cross-motions for summary

---

[18] *Bernstein v. TractManager, Inc.*, 953 A.2d 1003, 1007 n. 8 (Del. Ch. 2007).

[19] *Lillis v. AT&T Corp.*, 2006 WL 3860915, at *1 (Del. Ch. Dec. 21, 2006) (holding that "the submissions simply cannot be read as the equivalent to a stipulation for decision as contemplated under Rule 56(h)").

[20] *Id.* at *2 (internal quotation marks and citations omitted).

*AM General Holdings LLC v. The Renco Group, Inc.*
  C.A. No. 7639-VCS
*The Renco Group, Inc. v. MacAndrews AMG Holdings LLC*
  C.A. No. 7668-VCS
May 17, 2017
Page 19

judgment should the parties deem that to be the most efficient means to submit this

aspect of the dispute for final adjudication.

Very truly yours,

*/s/ Joseph R. Slights III*