# IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| BITGO HOLDINGS, INC., | § | |
| | § | No. 219, 2023 |
| Plaintiff Below, | § | |
| Appellant, | § | Court Below: Court of Chancery |
| | § | of the State of Delaware |
| v. | § | |
| | § | C.A. No. 2022-0808 |
| GALAXY DIGITAL HOLDINGS, | § | |
| LTD., GALAXY DIGITAL | § | |
| HOLDINGS LP, and GALAXY | § | |
| DIGITAL INC., | § | |
| | § | |
| | § | |
| Defendants Below, | § | |
| Appellees. | § | |

Submitted: February 7, 2024
Decided: May 22, 2024

Before **SEITZ**, Chief Justice; **VALIHURA**, **TRAYNOR**, **LEGROW**, and **GRIFFITHS**, Justices constituting the court *en banc*.

Upon appeal from the Court of Chancery. **REVERSED** and **REMANDED.**

A. Thompson Bayliss, Esquire (*argued*), Michael A. Barlow, Esquire, Eliezer Y. Feinstein, Esquire, ABRAMS & BAYLISS LLP, Wilmington, Delaware; R. Brian Timmons, Esquire, David M. Grable, Esquire, QUINN EMANUEL URQUHART & SULLIVAN, LLP, Los Angeles, California; David Cooper, Esquire, Deborah K. Brown, Esquire, Nathan Goralnik, Esquire, QUINN EMANUEL URQUHART & SULLIVAN, LLP, New York, New York, *for Appellants BitGo Holdings, Inc.*

Bradley R. Aronstam, Esquire, S. Michael Sirkin, Esquire, ROSS ARONSTAM & MORITZ LLP, Wilmington, Delaware; Andrew Ditchfield, Esquire (*argued*), Brian M. Burnovski, Esquire, Pascale Bibi, Esquire, Kyra Macy Kaufman, Esquire, DAVIS POLK & WARDWELL LLP, New York, New York; Neal Kumar Katyal, Esquire, Nathaniel A.G. Zelinsky, Esquire, HOGAN LOVELLS US LLP, Washington, D.C., Dennis H. Tracey, III, Esquire, HOGAN LOVELLS US LLP, New York, New York, *for Appellees Galaxy Digital Holdings Ltd., Galaxy Digital Holdings LP, and Galaxy Digital Inc.*

**TRAYNOR**, Justice:

In this appeal, we are asked to review the Court of Chancery's interpretation of a merger-agreement provision that required the acquired company—BitGo—to submit audited financial statements to the acquiror—Galaxy—by a specified date. When BitGo submitted the financial statements in a timely manner, Galaxy protested that the statements were deficient because they failed to apply recently published guidance from the Securities and Exchange Commission's staff. BitGo did not agree that the time was ripe for the application of that guidance, but took advantage of a provision in the merger agreement that allowed for another financial-statement submission and, according to Galaxy, extended the final deadline for completing the merger, or the "end date." When Galaxy received the second submission, this time applying the guidance not applied in the first submission, Galaxy found fault with the submission for other reasons—specifically, its inclusion of a "restriction on use" legend—and terminated the merger agreement.

BitGo then sued Galaxy in the Court of Chancery, alleging wrongful repudiation and breach of the merger agreement. Galaxy moved to dismiss the complaint, arguing that BitGo's claims failed as a matter of law because its noncompliant financial statements provided Galaxy with a valid basis to terminate the merger agreement. BitGo countered that both sets of statements, the ones that

2

did not apply the SEC staff's guidance and those that did, were compliant. The Court of Chancery sided with Galaxy and dismissed the complaint.

As discussed in detail below, whether the financial statements at issue were compliant turns on the interpretation of the merger agreement's definition of the term "Company 2021 Audited Financial Statements." The parties agree that, should this Court determine that BitGo's first submission—the submission with financial statements that did not apply the SEC staff's guidance—fit that definition, the adequacy of the second submission would be irrelevant and the Court of Chancery's decision should be reversed. If, however, the first submission was noncompliant, we must then assess the adequacy of the second submission. As with the first submission, if the second was compliant, reversal would be required.

Having considered the parties' respective positions, we have concluded that both parties have proffered reasonable interpretations of the merger agreement's definition of "Company 2021 Audited Financial Statements." In a word, the definition is ambiguous. We therefore reverse the Court of Chancery's judgment and remand for the consideration of such extrinsic evidence as may be appropriate to resolve this ambiguity.

3

# I

## A

Plaintiff BitGo Holdings, Inc. ("BitGo" or "the Company"), a Delaware corporation, is a privately held technology company that established the first independent, regulated custodial business for digital assets.[1]

Defendant Galaxy Digital Holdings Ltd. is a company formed under the laws of the Cayman Islands and headquartered in New York. Galaxy Digital Holdings Ltd. offers investment banking and other financial services in the cryptocurrency sector. Defendant Galaxy Digital Holdings LP is a limited partnership formed and registered under the laws of the Cayman Islands and headquartered in New York. Defendant Galaxy Digital Inc. is a Delaware corporation with its principal place of business in New York and is a direct wholly owned subsidiary of Galaxy Digital Holdings Ltd. We refer to the defendants collectively as "Galaxy."

## B

Galaxy became a strategic investor in BitGo in 2018. This investment brought with it an observer seat on BitGo's board of directors, through which Galaxy became privy to commercially sensitive and confidential information about the Company. By December 2020, aware of BitGo's "advanced discussions with other leading

---

[1] We draw the facts from the well-pleaded allegations in the verified amended complaint and from documents integral to it or incorporated by reference.

financial technology companies about possible strategic transactions[,]" Galaxy approached BitGo to discuss "potential synergies between the two companies[.]"[2] BitGo chose to pursue a transaction with Galaxy (the "Acquisition"), and the parties entered into a merger agreement in May 2021 (the "Original Agreement"). Under the Original Agreement, the end date for the transaction was set for March 31, 2022, allowing Galaxy time to, among other things, reincorporate in the United States and register its shares (together, the "Reorganization") with the Securities and Exchange Commission (the "SEC").

Galaxy told BitGo that this Reorganization, which contemplated the listing of Galaxy's shares on the Nasdaq exchange, was already underway independently from the Original Agreement. The Reorganization would require the approval of Galaxy's shareholders and, hence, Galaxy was required to file an S-4 registration statement with the SEC. Because Galaxy would acquire all of BitGo's outstanding shares in exchange for 33.8 million shares of Galaxy's reorganized entity and $265 million in cash, the Original Agreement's success depended on the success of Galaxy's Reorganization. The aggregate consideration for acquiring BitGo, based on Galaxy's then-current share price, was approximately $1.2 billion.

According to the complaint, the parties allocated the risks associated with the Reorganization almost entirely to Galaxy. For example, Galaxy assumed

---

[2] *See* App. to Opening Br. at A36.

responsibility for and control over governmental approvals. But BitGo bore a critical, albeit limited, role in helping Galaxy submit information for inclusion in an effective registration statement. BitGo was required to submit to Galaxy its financial statements for the year ended December 31, 2020, which the agreement defined as "Company 2020 Audited Financial Statements." These financial statements were to be "'in a form that complies with the requirements of Regulation S-X for an offering of equity securities pursuant to a registration statement on Form S-1 for a non-reporting company.'"[3] BitGo's failure to submit the financial statements to Galaxy on time would provide Galaxy with a termination right. No termination fees of any kind, though, were available under the Original Agreement.

BitGo submitted the Company 2020 Audited Financial Statements to Galaxy in September 2021. Galaxy accepted them. Together with a report from BitGo's auditor, Galaxy provided the statements as part of its confidential draft registration statement to the SEC. In the ensuing months, BitGo assisted Galaxy by responding to numerous data requests and consulting with Galaxy's finance and legal teams, as Galaxy engaged with the SEC and its extensive commentary on the draft submissions. The SEC's comments inquired into Galaxy's accounting and internal controls practices, which, according to the complaint, included significant errors and weaknesses; by contrast, the SEC did not raise concerns about BitGo's financial

---

[3] *Id.* at A41.

statements. After several rounds of revisions, Galaxy publicly filed its S-4 registration statement on January 28, 2022, which included BitGo's 2020 Audited Financial Statements and other information.

It became clear to Galaxy by February 2022 that time was running out for closing the Acquisition under the Original Agreement. Galaxy would not be able to secure an effective S-4 registration statement, notice a shareholder meeting, hold a shareholder vote, and complete the Reorganization and Acquisition before March 31, 2022. But BitGo was reluctant to grant Galaxy an extension. After all, the transaction had been pending for nearly a year, foreclosing other potentially lucrative transactions, and the industry was experiencing a boom. To assuage BitGo's concerns, the parties agreed to several new terms, including a reverse termination fee of $100 million, payable to BitGo if, among other reasons, the Acquisition did not close by the new end date. The parties signed an amended agreement (the "Amended Agreement") on March 30, 2022, the day before the Original Agreement's end date.

The Amended Agreement bought Galaxy more time by pushing the end date to December 31, 2022. And if certain conditions were met, then the end date could be extended for three more months. Because Galaxy was required to submit an amended S-4 registration statement to the SEC, BitGo was again required to deliver financial statements to Galaxy—this time what the agreement referred to as

7

"Company 2021 Audited Financial Statements." The definition of this term, which is otherwise identical to the definition of Company 2020 Audited Financial Statements, updated the year, replaced a reference to a specific auditor with a general one, and required a report for 2021 only rather than reports for 2020 and 2019. Because the 2021 definition is central to the parties' dispute, we quote it here in full:

> "**Company 2021 Audited Financial Statements**" means the audited financial statements of the Company and its Subsidiaries as of and for the year ended December 31, 2021, including the accompanying notes, prepared in accordance with GAAP and in a form that complies with the requirements of Regulation S-X for an offering of equity securities pursuant to a registration statement on Form S-1 for a non-reporting company and audited in accordance with PCAOB auditing standards by a PCAOB-qualified accounting firm that is independent from the Company and such Subsidiaries under Rule 2-01 of Regulation S-X under the Securities Act, together with auditor's reports from such independent accounting firm (which reports shall include an unqualified opinion that such financial statements present fairly, in all material respects, the consolidated financial position of the Company and its Subsidiaries as of December 31, 2021 and the results of their operations and their cash flows for the year ended in accordance with GAAP).[4]

When companies like Galaxy seek to register their securities on a stock exchange like Nasdaq, the SEC requires the applicants to submit registration statements in varying forms. For example, because Galaxy was attempting to consummate both the Reorganization and Acquisition, Galaxy originally filed a Form S-1 (initial registration statement) and Form S-4 (registration statement for a

---

[4] *Id.* at A100–01.

company involved in a merger or acquisition). SEC Regulation S-X "sets forth the form and content of and requirements for" financial statements to be filed as a part of some such registration statements.[5] For the SEC to declare a registration statement effective, the statement must comply with Regulation S-X—and the parties drafted the Amended Agreement with this compliance goal in mind.

The Amended Agreement defines neither Regulation S-X nor Rule 2-01 of Regulation S-X. But § 1.02 of the Amended Agreement, titled "*Other Definitional and Interpretative Provisions*," states that "[r]eferences to any statute, rule, regulation, law or Applicable Law shall be deemed to refer to such statute, rule, regulation, law or Applicable Law as amended or supplemented from time to time and to any rules, regulations and interpretations promulgated thereunder."[6] Applicable Law, in contrast, means

> with respect to any Person, any transnational, domestic or foreign federal, state, provincial or local law (statutory, common or otherwise), constitution, treaty, convention, ordinance, code, rule, regulation, order, injunction, judgment, decree, ruling or other similar requirement enacted, adopted, promulgated or applied, in each case, by a Governmental Authority, and authoritative interpretations of each of the foregoing, in each case that is binding upon or applicable to such Person or its properties.[7]

---

[5] 17 C.F.R. § 210.01.
[6] App. to Opening Br. at A129.
[7] *Id.* at A96.

The parties also selected April 30, 2022 as the deadline for submitting the 2021 statements (the "April Submission"). BitGo's failure to furnish the statements by that date would have two consequences: (i) BitGo would then have until July 31, 2022 to deliver the statements (the "July Submission") and (ii) the end date would automatically be extended to March 2023. If BitGo failed to submit compliant statements to Galaxy by July 31, then Galaxy could exercise its right to terminate the agreement without having to pay the reverse termination fee.

The day after the Amended Agreement was signed, the SEC published Staff Accounting Bulletin No. 121 ("SAB 121" or the "Bulletin"). The Bulletin detailed new accounting guidance applicable to filings by certain public companies and SEC registrants that safeguard, or act as custodians for, digital assets as part of their business plan. Early in the document, the Bulletin disclosed that the

> statements in staff accounting bulletins are not rules or interpretations of the Commission, nor are they published as bearing the Commission's official approval. They represent staff interpretations and practices followed by the staff in the Division of Corporation Finance and the Office of the Chief Accountant in administering the disclosure requirements of the federal securities laws.[8]

Later in the document, the Bulletin describes the parties whom the staff expects will comply with SAB 121, together with timelines for implementation.

---

[8] *Id.* at A804.

SAB 121 became effective on April 11, fewer than three weeks before BitGo was to submit its financial statements to Galaxy. Although BitGo's auditor was aware of SAB 121, the auditor did not apply it to the Company 2021 Audited Financial Statements that BitGo supplied to Galaxy on April 29, 2022, the day before the submission deadline. The Company 2021 Audited Financial Statements were audited and presented in the same form as the Company 2020 Audited Financial Statements that BitGo had delivered to, and were accepted by, Galaxy seven months earlier. Accompanying BitGo's Company 2021 Audited Financial Statements was the auditor's opinion that the "'financial statements present fairly, in all material respects, the financial position of [BitGo] as of December 31, 2021, and the results of its operations and its cash flows for the year then ended in accordance with accounting principles generally accepted in the United States.'"[9] The auditor also stated in a note that

> SAB 121 will likely require the Company to record an obligation to the balance sheet relating to its obligation to safeguard any crypto-assets held for their platform users and a corresponding indemnification asset of assets held under custody. The Company is currently evaluating the effect this new guidance will have related to obligations to safeguard crypto-assets, corresponding indemnification asset[s] and its consolidated financial statements.[10]

---

[9] *Id.* at A50.
[10] *Id.* at A51, A688.

The day after BitGo's April Submission, Galaxy responded that, because the financial statements did not "'appear to give effect to SAB 121,'" the statements failed to meet the definition of Company 2021 Audited Financial Statements.[11] According to Galaxy, this meant that the end date was automatically extended. BitGo responded that SAB 121 was inapplicable to the statements. BitGo insisted, as the complaint recounts, that SAB 121's instructions made plain that it applied to entities other than BitGo and, in any event, on a timeline for implementation well after the April Submission. Galaxy nevertheless held fast to its position—that the submission's failure to apply SAB 121 meant the financial statements were contractually noncompliant—but raised no other concerns about the statements. Galaxy emphasized that BitGo should apply SAB 121 to assist Galaxy with its goal of securing SEC approvals. BitGo disagreed with Galaxy's position and stated that the end date remained December 31, 2022. Even so, BitGo began preparing Company 2021 Audited Financial Statements that applied SAB 121, in what BitGo described as an "accommodation" to Galaxy.[12]

Meanwhile, Galaxy was not only facing challenges in securing SEC approvals; it was facing financial headwinds too. Signs of financial problems emerged when Galaxy reported a loss of $111.7 million for the first quarter of 2022.

---

[11] *Id.* at A52.
[12] *Id.* at A54.

Near that time, the parties executed the Amended Agreement when Galaxy's share price was CA$24.82,[13] a decrease from the calendar-high price of CA$26.65 posted two days earlier. Less than a month later and on the same day of the April Submission, Galaxy's share price dropped to CA$14.05, a symptom of broader stress in the cryptocurrency and bitcoin markets. Within days, the Luna cryptocurrency, in which Galaxy was heavily invested, suddenly collapsed, ushering in what has been described in the industry as the "crypto winter."

The day that Luna collapsed, Galaxy's shares closed at CA$7.72. The next day, Galaxy took the unusual step of furnishing a preliminary, mid-quarter update of its capital and liquidity position. Galaxy disclosed that it had suffered an approximately $300 million loss thus far in the quarter-to-date alone. Contextualizing the loss in terms of broader trends, Galaxy revealed that "'total cryptocurrency market capitalization had decreased approximately 40%.'"[14] In an open letter to shareholders a few days later, Galaxy's CEO Mike Novogratz acknowledged that Luna was "'a big idea that failed,'" and said that Galaxy would have to "'manage its balance sheet appropriately with respect to the macroeconomic backdrop,'" which would "'remain challenging[.]'"[15] As the second quarter of 2022

---

[13] "CA" is shorthand for Canadian dollars.
[14] App. to Opening Br. at A56 (emphasis omitted).
[15] *Id.* at A57.

13

ultimately turned out, Galaxy's losses ballooned to $554.7 million, a figure more than triple the quarterly loss from the prior year.

The complaint alleges that, in mid-May 2022, the Amended Agreement, with its $1.2 billion price tag, represented Galaxy's most costly upcoming financial commitment. At the same time, during an earnings call, Novogratz expressed that it was "'so frustrating'" how much time the process was taking for not only Galaxy but also others in the industry to secure approvals for the U.S. listing of their shares.[16] Within the same month, BitGo and Galaxy learned that the SEC had expressed concerns about accounting practices related to the lending of digital assets, a segment of the industry that represented a major part of Galaxy's business. But the SEC only raised questions at this time; it did not provide definitive answers for how to resolve them.

BitGo urged Galaxy to seek pre-clearance from the SEC regarding these new accounting issues. BitGo suggested this course of action because of Galaxy's contractual obligation both to spearhead interactions with the SEC and to use commercially reasonable efforts to consummate the Reorganization and Acquisition. Doing so, BitGo underscored, could have prevented progress on the parties' agreement from stalling. Moreover, the uncertainty surrounding these accounting issues prevented not only Galaxy but also BitGo from "even seeking consent from

---

[16] *Id.* at A59 (emphasis omitted).

14

their respective auditors to include their audited financial statements in an Amended S-4 filing."[17] Galaxy refused BitGo's request that it seek pre-clearance, choosing instead to await guidance from the American Institute of Certified Public Accountants once its digital-asset working group reached consensus with the SEC. Whenever BitGo would request updates on Galaxy's progress on preparing the draft amended S-4 and other transaction milestones, Galaxy deflected the inquiries, providing neither a timeline nor meaningful answers.[18]

Around this time, comments from an unlikely source augured ill for BitGo in the coming months. A senior Galaxy officer admitted privately to BitGo's CEO that the officer had attended meetings where Galaxy and its attorneys discussed plans to exit the Amended Agreement. Galaxy would blame the unraveling of the transaction on BitGo, which meant that Galaxy could walk away without paying the $100 million reverse termination fee.[19]

And it came to pass. At the end of July 2022, when BitGo provided to Galaxy its second set of Company 2021 Audited Financial Statements—this time applying SAB 121—Galaxy raised several objections to them. In August, Galaxy informed BitGo that the July Submission was deficient because (i) the auditor report submitted with the statements was "'intended solely for the information and use of BitGo . . .

---

[17] *Id.* at A62.
[18] *Id.* at A61–62.
[19] *See id.* at A64.

15

and Galaxy . . . ,'" which Galaxy viewed as a restriction on use that was incompatible with Regulation S-X (the "Restriction on Use Legend"), and (ii) the statements were audited in accordance with generally accepted auditing standards, or GAAS, rather than the Public Company Accounting Oversight Board, or PCAOB, standards.[20]

As to the Restriction on Use Legend on the auditor's report, BitGo responded that, because Galaxy was nowhere close to submitting an amended S-4 to the SEC (in part, a result of the uncertainty surrounding accounting guidance for digital asset lending), and because the auditor's consent could not be given until the auditor reviewed the draft amended S-4, the auditor's consent was not required at that time. BitGo also maintained that the report's language limiting its use to the parties was consistent with the Amended Agreement. As to the PCAOB standards, BitGo said that Galaxy knew that BitGo, a private company, had its auditor employ GAAS instead of PCAOB, and Galaxy had accepted and used the Company 2020 Audited Financial Statements that applied GAAS in multiple confidential submissions to the SEC and the publicly filed first version of the registration statement.

For Galaxy, however, the purported deficiencies of the July Submission sounded the death knell for the Amended Agreement. Galaxy sent BitGo a termination notice on August 12, 2022, triggered by BitGo's purported failure to deliver Company 2021 Audited Financial Statements by July 31, 2022. Galaxy

---

[20] *Id.* at A30, A65–66, A70–71.

16

trumpeted the same message publicly in a press release issued three days later, declaring that "'[n]o termination fee is payable in connection with the termination.'"[21] Following the press release, Novogratz claimed that Galaxy was "'still full steam ahead with the [Nasdaq] listing.'"[22] But he offered no timeline for when the process would be completed.

## C

In September 2022, BitGo sued Galaxy in the Court of Chancery. The amended complaint alleged three counts: (i) wrongful repudiation of the Amended Agreement, (ii) breach of contract, and (iii) breach of the implied covenant of good faith. Galaxy moved to dismiss under Court of Chancery Rule 12(b)(6) for failure to state a claim upon which relief can be granted. After the parties briefed the motion, the Court of Chancery held oral argument in June 2023 and then announced its decision from the bench. The court dismissed the complaint and held that the plain language of the Amended Agreement required BitGo to apply SAB 121 to the April Submission. It reasoned that, under the definition of Company 2021 Audited Financial Statements, the April Submissions had to be in a form that could actually be used "for an offering of equity securities pursuant to a registration statement . . . ." According to the court, BitGo's submission was noncompliant

---

[21] *Id.* at A72.
[22] *Id.*

17

because the financial statements did not comply with SAB 121 and therefore could not be used to gain registration. The alleged deficiency automatically triggered the extension of the end date.

This result, in turn, gave rise to the possibility that a defective July Submission would be grounds for termination. The court found that the July Submission was defective because "the 2021 audited financial statements had a condition that limited their use[,] . . . [a] condition [that] was inconsistent with Regulation S-X and [that] renders them incapable of being used in a Form S-1."[23] The court's support for this conclusion was a letter that the SEC Acting Chief Accountant and Director of Corporation Finance addressed to the president of the Institute of Chartered Accountants of England and Wales (the "2003 Letter"). In the court's view, the July Submission failed to observe the 2003 Letter's instruction that "'[i]n no circumstances, . . . should an audit opinion containing restrictions, such as the UK form of audit opinion, be included as part of, or incorporated into, the annual report on Form 20-F or any other report filed with the Commission.'"[24] The court opined

---

[23] Opening Br. Ex. A ("Tr. Ruling") at 76.
[24] Tr. Ruling at 84; *see also* App. to Opening Br. at A860–61.

that the 2003 Letter created a requirement under Regulation S-X.[25] And the July

Submission's noncompliance with this requirement, according to the court, provided

Galaxy with a "clean contractual basis for termination" that swallowed up all three

counts of the complaint.[26]  The court entered final judgment in favor of Galaxy that

same day.

D

On appeal, BitGo argues that the Court of Chancery erred by (i) holding that

BitGo's April Submission did not meet the definition of Company 2021 Audited

Financial Statements because they did not apply SAB 121, (ii) holding that BitGo's

July Submission failed to meet the definition of Company 2021 Audited Financial

Statements based on the auditor's language restricting the use of its report, and

(iii) dismissing BitGo's claims based on Galaxy's breach of the Amended

Agreement, which required Galaxy to use commercially reasonable efforts to resolve

issues related to the lending of digital assets, which breach BitGo urges was the

---

[25] *See, e.g.*, Tr. Ruling at 82–85.  After reading the foregoing passage from the 2003 Letter, the court stated, "[t]hat is about as clear a statement of policy on this issue as you can get."  *Id.* at 84. The court then rejected BitGo's argument that the letter was not "part of Regulation S-X[.]"  *Id.* Instead, the court said that "[w]hen you have clear guidance from the SEC about something that is absolutely not permitted in any filing with the SEC, it is clear that a set of financial statements containing that restriction would not comply with the requirements of Regulation S-X for an offering of equity securities pursuant to a registration statement on form S-1 for a nonreporting company."  Thus, the court seems to have treated the 2003 Letter as a requirement of Regulation S-X.  *See id.* at 82–85.

[26] *Id.* at 76.

origin of the Restriction on Use Legend. BitGo did not appeal the dismissal of its third and final count, which alleges a breach of the implied covenant of good faith.

Galaxy responds that the Court of Chancery was correct, as a matter of law, that SAB 121 applied to the April Submission. In support of this position, Galaxy contends that SAB 121's express language makes clear that it applies to entities such as BitGo and dovetails with the definition of Company 2021 Audited Financial Statements. Galaxy also points to BitGo's alleged concession in the April Submission that the application of SAB 121 was required and the July Submission's actual application of SAB 121 as evidence that undercuts BitGo's appeal.

Galaxy also defends the Court of Chancery's conclusion that the Restriction on Use Legend in the July version of BitGo's financial statements rendered them noncompliant with the contractual definition of Company 2021 Audited Financial Statements. Thus, according to Galaxy, the trial court did not err when it found that Galaxy validly terminated the Amended Agreement.

Because we have concluded that the Amended Agreement's language governing BitGo's April and July Submissions is ambiguous, we focus the balance of our discussion on that issue.

20

II

A

We review the Court of Chancery's grant of a motion to dismiss *de novo*,[27]

which means that we

> '(1) accept all well pleaded factual allegations as true, (2) accept even
> vague allegations as 'well pleaded' if they give the opposing party
> notice of the claim, (3) draw all reasonable inferences in favor of the
> non-moving party, and (4) do not affirm a dismissal unless the plaintiff
> would not be entitled to recover under any reasonably conceivable set
> of circumstances.'[28]

Moreover, "whether a contract is unambiguous is a question of law[.]"[29]  Questions

of contract construction are reviewed *de novo*.[30]

The basic principles that guide us when we review a trial court's interpretation

of a contract are well settled.  "When interpreting a contract, Delaware courts read

the agreement as a whole and enforce the plain meaning of clear and unambiguous

language."[31]  "'Delaware law adheres to the objective theory of contracts, *i.e.,* a

contract's construction should be that which would be understood by an objective,

reasonable third party.'"[32]  "'The true test is not what the parties to the contract

intended it to mean, but what a reasonable person in the position of the parties would

[27] *In re GGP, Inc. S'holder Litig.*, 282 A.3d 37, 54 (Del. 2022).
[28] *Id.* (citation omitted).
[29] *Sunline Com. Carriers, Inc. v. CITGO Petroleum Corp.*, 206 A.3d 836, 847, 847 n.68 (Del. 2019).
[30] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1158 (Del. 2010).
[31] *Manti Holdings, LLC v. Authentix Acquisition Co, Inc.*, 261 A.3d 1199, 1208 (Del. 2021).
[32] *Salamone v. Gorman*, 106 A.3d 354, 367–68 (Del. 2014) (citing *Osborn*, 991 A.2d at 1159).

have thought it meant.'"[33]  If a contract is "plain and clear on its face, *i.e.,* its language conveys an unmistakable meaning, the writing itself is the sole source for gaining an understanding of intent."[34]  Stated differently, clear and unambiguous language is "reasonably susceptible of *only one* interpretation."[35]  Language from a contract need not be perfectly clear for an interpretation of it to be deemed as the only reasonable one.[36]

An "interpretation that conflicts with the plain language of a contract is not reasonable[,]"[37] but an interpretation can be at once both "reasonable, though problematic[.]"[38]  Accordingly, "although the 'more natural[]' reading is a factor to be considered, it does not conclude the analysis.  Even a 'less natural' reading of a contract term may be 'reasonable' for purposes of an ambiguity inquiry."[39]

A provision in a contract is ambiguous "when the provision in controversy is reasonably or fairly susceptible of different interpretations or may have two or more different meanings."[40]  "[I]f the words of the agreement 'can only be known through an appreciation of the context and circumstances in which they were used'" at the

---

[33] *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006) (citing *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co*., 616 A.2d 1192, 1196 (Del. 1992)).

[34] *City Inv. Co. Liquidating Tr. v. Cont'l Cas. Co.*, 624 A.2d 1191, 1198 (Del. 1993).

[35] *Rhone-Poulenc*, 616 A.2d at 1196 (emphasis added).

[36] *See Hercules, Inc. v. AIU Ins. Co.*, 784 A.2d 481, 506 (Del. 2001).

[37] *Bank of New York Mellon v. Commerzbank Cap. Funding Tr. II*, 65 A.3d 539, 555 (Del. 2013).

[38] *Phillips Home Builders, Inc. v. Travelers Ins. Co.*, 700 A.2d 127, 130 (Del. 1997).

[39] *Bank of New York Mellon*, 65 A.3d at 550.

[40] *Rhone-Poulenc*, 616 A.2d at 1196.

time of drafting, then the language is ambiguous, such that "a court is not free to disregard extrinsic evidence of what the parties intended."[41] It is also true that we "do not consider extrinsic evidence unless we find that the text is ambiguous."[42] Extrinsic evidence may not to be used to "create an ambiguity."[43] Finally—and importantly for present purposes—"[d]ismissal is proper only if the defendants' interpretation is the *only* reasonable construction as a matter of law."[44]

B

We begin with a review of the crucial contractual definition of "Company 2021 Audited Financial Statements" and the Court of Chancery's conclusion that the April Submission did not measure up to it. This exercise is, in the court's words, "important because if Galaxy wrongfully rejected the April version of the financial statements, then the end date would not extend, and the termination right on which Galaxy relied would not be available."[45]

The definition of "Company 2021 Audited Financial Statements," which we quoted earlier in full,[46] includes the requirement that the statements be "prepared . . .

---

[41] *See City Inv.*, 624 A.2d at 1198.

[42] *Samuel J. Heyman 1981 Continuing Tr. For Lazarus S. Heyman v. Ashland LLC*, 284 A.3d 714, 721 (Del. 2022).

[43] *See Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997).

[44] *Vanderbilt Income and Growth Assocs., L.L.C. v. Arvida/JMB Managers, Inc.*, 691 A.2d 609, 613 (Del. 1996) (emphasis in original) (citations omitted) (observing that "[o]n a motion to dismiss for failure to state a claim, a trial court cannot choose between two differing reasonable interpretations of ambiguous documents.").

[45] Tr. Ruling at 76–77.

[46] *See supra* p. 8.

in a form that complies with the requirements of Regulation S-X for an offering of equity securities pursuant to a registration statement on Form S-1 for a non-reporting company . . . ."[47]  Because the definition does not expressly mention SAB 121, its inclusion must hinge on whether its application to BitGo's financial statements when they were submitted on April 29, 2022 was a requirement on that date.  Under BitGo's interpretation, it was not.

BitGo's interpretation finds support in the explicit interpretative guidance the Amended Agreement itself provides.  Specifically, § 1.02 of the Amended Agreement, titled "Other Definitional and Interpretative Provisions," explains that "[r]eferences to any statute, rule, *regulation*, law or Applicable Law shall be deemed to refer to such statute, rule, regulation, law or Applicable Law as *amended* or *supplemented from time to time and to any rules, regulations and interpretations promulgated thereunder.*"[48]  Taken together, § 1.02 and the definition of Company 2021 Audited Financial Statements expand the scope of "requirements of Regulation S-X" to include compliance with any "rules, regulations, and interpretations promulgated thereunder."  Neither the Court of Chancery nor Galaxy disagree that § 1.02 applies here—but neither considered how § 1.02 relates to the definition of Company 2021 Audited Financial Statements.

---

[47] App. to Opening Br. at A100–01.
[48] *Id.* at A129 (emphasis added).

BitGo does not contest that the Company 2021 Audited Financial Statements must comply with Regulation S-X and interpretations promulgated thereunder. It posits that the dispositive question is whether SAB 121 is an "interpretation[] promulgated under Regulation S-X."[49] BitGo argues that it is not for three reasons.

First, BitGo notes that SAB 121 does not mention Regulation S-X or purport to interpret its text. On this point, BitGo cites staff accounting bulletins that actually purport to interpret Regulation S-X, which make specific reference to it.[50] BitGo next observes that Regulation S-X does not provide for the promulgation of staff accounting bulletins and that "nothing in SAB 121 indicates it was an interpretation promulgated under Regulation S-X."[51] Finally, BitGo contends that, because SAB 121 "has no force of law," it was not "promulgated at all,"[52] within the plain meaning of that word. Importantly, BitGo notes that the text of SAB 121 itself clarifies that the guidance it provides does not constitute "rules or interpretations of the Commission, nor [is it] published as bearing the Commission's official approval."[53]

---

[49] *Id.*

[50] *See*, *e.g.*, *id.* at A857, Staff Accounting Bulletin No. 69 (May 8, 1987) (expressing staff views regarding "[t]he use of Article 9 of Regulation S-X"); *id.* at A853, Staff Accounting Bulletin No. 53 (June 13, 1983) ("express[ing] the staff's views with respect to certain disclosure and reporting requirements relating to the issuance of securities guaranteed by affiliates of the issuer and to Rule 3-10 of Regulation S-X") (cited at Opening Br. 27–28).

[51] Opening Br. at 28.

[52] *Id.*

[53] App. to Opening Br. at 804.

Galaxy's response to these contentions focuses on whether SAB 121 is an "interpretation" that is applicable to entities like BitGo. Galaxy chides BitGo, for instance, for ignoring "that SAB 121 states that it provides 'interpretations' applicable to the financial statements of companies charged with safeguarding crypto assets (like BitGo) . . . ."[54] Galaxy also cites authority for the proposition that courts accept staff accounting bulletins as "'interpretations and practices'" followed by the SEC.[55] And Galaxy takes issue with BitGo's understanding of what it means to "promulgate" an interpretation. But Galaxy never squarely addresses whether SAB 121 was an "interpretation promulgated under" Regulation S-X.

Instead of focusing on § 1.02 and its interpretative guidance, the Court of Chancery relied on the language from the definition of Company 2021 Audited Financial Statements. According to the court, the issue was whether the April Submission was in a form that could actually be filed with the SEC. The court found that it was not because SAB 121 had to be applied in the "next submission or filing with the SEC,"[56] which, according to the court, was "the contemplated S-1."[57]

---

[54] Answering Br. at 22.

[55] *Id.* at 23 (citing *Ginano v. Citizens Utils. Co.*, 228 F.3d. 154, 163 (2d Cir. 2000)).

[56] App. to Opening Br. at 808 (SAB 121 states that "the staff expects . . . entities . . . to apply the guidance . . . beginning with their next submission or filing with the SEC (e.g., the initial or next amendment of the registration statement, proxy statement, or Form 1-A), with retrospective application, at a minimum, as of the beginning of the most recent annual period ending before June 15, 2022 . . . .").

[57] Tr. Ruling at 79. We note here that, although the Court of Chancery described the parties' next filing with the SEC as "the contemplated S-1," the amended complaint asserts that the parties' next contemplated SEC filing was an amended S-4: "Galaxy continued to emphasize that its only

26

The court also considered the Amended Agreement's definition of "Applicable Law." The court recognized that the "Applicable Law" provision was not "directly applicable"[58] to the definition, but that it nevertheless provided a "signal . . . that when there is a law to be complied with, the obligation extends not only to the regulations themselves but also to interpretations like SAB 121."[59] And finally, the court relied on "the financial statements self-acknowledge[ment] in the notes that there is a need to comply with SAB 121"[60] and the adherence to SAB 121's guidance in BitGo's July Submission. We take up these reasons for the Court of Chancery's conclusion in turn.

---

concern was that BitGo should retrospectively apply SAB 121 to assist Galaxy and HoldCo's eventual filing of the Amended S-4. The parties' understanding was that Galaxy and HoldCo would not file on Form S-1." App. to Opening Br. at A53–54. As best we can discern, neither party has challenged this assertion.

[58] Tr. Ruling at 79–80. The court's invocation of the "Applicable Law" provision and our characterization of it is reflected in the following passage from the court transcript ruling: "Galaxy has also invoked to its aid Section 1.02 and the definition of 'Applicable Law.' *I don't think that provision is directly applicable.* The definition of "Applicable Law" is just that, a defined term, 'Applicable Law.' *The definition of 'Company Financial Statements' doesn't say 'compliance with the requirements of Applicable Law.' It specifically says 'compliance with the requirements of Regulation S-X.'* 'Applicable Law' is used in other sections of the agreement, most notably in the representation that the company is, in fact, in compliance with Applicable Law. But *'Applicable Law' is not directly implicated in the definition of 'Company 2021 Audited Financial Statements.' It is, however, a signal* as to what people thought compliance meant. And what that definition indicates is that is when there is a law to be complied with, the obligation extends not only to the regulations themselves but also to interpretations like SAB 121." (emphasis added).

[59] *Id*. at 80.

[60] *Id*.

C

We see the timing issue—that is, the applicability of SAB 121 to BitGo's financial statements *as of April 30, 2022*—as decisive. The question, in our view, is not whether BitGo would ultimately be required to apply SAB 121's guidance to the Company 2021 Audited Financial Statements in its next submission or filing with the SEC, the contemplated filing of which was months away. Rather, the relevant question is whether, on April 30, 2022—the deadline for the April Submission—the financial statements were "in a form that complies with the requirements of Regulation S-X for an offering of equity securities pursuant to a registration statement on Form S-1 for a non-reporting company[.]"[61] And a finding that the April Submission met the definition as of the deadline would be dispositive here because Galaxy's assertion that BitGo's submission "d[id] not meet the definition of [Company 2021] Audited Financial Statements" was the sole basis for its rejection of the statements[62] without which Galaxy's termination right would not have arisen.[63]

---

[61] App. to Opening Br. at A100–01.

[62] *Id.* at A699.

[63] Galaxy concedes as much on appeal. Delaware Supreme Court, *Oral Argument Video: BitGo Holdings, Inc. v. Galaxy Digital Holdings Ltd.*, at 31:40–32:40 (Dec. 6, 2023) (https://vimeo.com/891912984) (Galaxy's admission that if the April Submission was compliant, "everything else falls away, and I think we're back into the Chancery Court"). Both the Court of Chancery and Galaxy also agreed on this point at oral argument on Galaxy's motion to dismiss. *See* Tr. Ruling at 33–34; 76–77. There, the court asked Galaxy's counsel to assume that Galaxy "incorrectly asserted that SAB 121 applies . . . [and] in fact, the Company 2021 Audited Financial Statements were contractually compliant," and to "take [the court] through what happens if that's

As mentioned, the Court of Chancery focused on the SEC guidance that BitGo might be required to follow in its next submission or filing of financial statements with the SEC. In essence, the court read the relevant definition as requiring BitGo to submit "file-ready" statements by April 30, 2022, even though the next filing was months in the future at a time when the questions of SAB 121's applicability and the SEC's position on accounting practices related to the lending of digital assets were subject to uncertainty. In reaching this conclusion, however, the court did not address § 1.02's interpretative guidance.

On appeal, the parties joined issue over § 1.02 and whether SAB 121 was "promulgated" as that word is used in § 1.02 of the Amended Agreement. BitGo favors a narrow definition that involves an administrative agency's "'formal process of rulemaking by publishing the proposed regulation, inviting public comments, and approving or rejecting the proposal.'"[64] Galaxy, on the other hand, favors a broader definition that simply refers to the SEC's ability to "'declare or announce publicly; to proclaim[.]'"[65] If BitGo's preferred definition applies, then it would seem that SAB 121 was not "promulgated." Conversely, SAB 121 was declared and announced publicly and therefore "promulgated" under Galaxy's definition. On this

<hr>

the case" to which Galaxy's counsel replied, "if [BitGo] deliver[ed] contractually compliant financial statements as of April 30, 2022, [Galaxy] ha[d] an obligation to move forward[.]"
[64] Opening Br. at 29–30 (citing *Promulgate*, Black's Law Dictionary (9th ed. 2009)).
[65] Answering Br. at 25 n.5 (citing *Promulgate*, Black's Law Dictionary (11th ed. 2019)).

pleading-stage record and without the benefit of any guidance as to the word's accepted meaning in the world of securities regulation, we are not prepared to say that either of these definitions is unreasonable.

Under its proffered definition of "promulgate," BitGo argues that nothing in SAB 121 suggests that it was required by or promulgated under Regulation S-X. In fact, SAB 121's text does not even mention Regulation S-X, though it refers to other SEC regulations, such as Regulation A and Regulation S-K. What is more, BitGo argues, the text of SAB 121 expressly disclaims that it provides officially sanctioned interpretative guidance. The Bulletin says,

> statements in staff accounting bulletins are not rules or interpretations of the Commission, nor are they published as bearing the Commission's official approval. They represent staff interpretations and practices followed by the staff in the Division of Corporation Finance and the Office of the Chief Accountant in administering the disclosure requirements of the federal securities laws.[66]

This disclaimer, together with the absence of any reference to Regulation S-X in SAB 121, leads BitGo to conclude that SAB 121 was not promulgated under Regulation S-X.

Alternatively, BitGo argues that, even if SAB 121 was promulgated under Regulation S-X, the Bulletin's own terms did not expressly require BitGo to apply

---

[66] App. to Opening Br. at A804.

its guidance in April 2022. The relevant language from SAB 121 reflects the expectation that entities will apply its guidance

> beginning with their next submission or filing with the SEC (e.g. the initial or next amendment of the registration statement, proxy statement, or Form 1-A), with retrospective application, at a minimum, as of the beginning of the most recent annual period ending before June 15, 2022 . . . ."[67]

BitGo homes in on the phrase "retrospective application," describing it as an "esoteric accounting practice[]" or "a term of art[.]"[68] In BitGo's view, the meaning of this term presented a factual question that the court mistakenly decided without the benefit of expert testimony, requiring the April Submission to apply SAB 121 "*contemporaneously*, not retrospectively."[69]

But as BitGo tells it, "retrospective application" is a term that "refers to 'the application of a different accounting principle to one or more *previously issued* financial statements.'"[70] BitGo asserts that the April Submission was properly prepared based on the accounting guidance applicable at the end of BitGo's fiscal year; whatever adjustments SAB 121 required "would be 'retrospectively adjusted *in the future* as a result of the change.'"[71] Had the court appreciated the distinction, BitGo suggests, the court would not have "effectively reject[ed] [BitGo's auditor's]

---

[67] *Id.* at A808; *see* Opening Br. at 31.
[68] Opening Br. at 31–32.
[69] *Id.* (emphasis in original).
[70] *Id.* (emphasis in original) (citing App. to Opening Br. at A850, ASC Topic 250-20).
[71] *Id.* at 32 (emphasis in original) (citing SEC Staff Accounting Bulletin Codification Topic 11.M).

31

understanding of the applicable accounting standards as a matter of law."[72]  BitGo further claims that, under the Amended Agreement, § 13.01's "text and structure . . . embed[] the distinction between *retrospective application* and a prior-period *restatement*[,]" such that the agreement allowed for the former but not the latter.[73]

In answer to BitGo's primary argument that SAB 121 was wholly inapplicable, Galaxy builds on the Court of Chancery's view that the definition of Company 2021 Audited Financial Statements calls for "file-ready" statements.  That is, Galaxy emphasizes that BitGo's statements were to be "in a form that complies with the requirements of Regulation S-X for an offering of equity securities pursuant to a registration statement on Form S-1 for a non-reporting company[.]"[74]  Combining this language with language from § 9.07 of the Amended Agreement,[75] Galaxy avers that BitGo's financial statements "had to be in a form that could actually be filed with—and accepted by—the SEC as part of Galaxy's forthcoming registration statement."[76]

---

[72] *See id.* at 34.

[73] *Id.* at 33–34 (citing § 13.01(b), (h)).

[74] App. to Opening Br. at 100–01; Answering Br. at 17–18.

[75] App. to Opening Br. at A218.  Under § 9.07, BitGo's submissions to Galaxy were "required to be included in the [registration statement] under the Securities Act and the rules and regulations promulgated thereunder in order for any such registration statement to be declared effective by the SEC."  *Id.*

[76] Answering Br. at 18.

Galaxy then ties SAB 121 to Regulation S-X in three steps. First, Galaxy argues that Regulation S-X "governs the form, content, and requirements of financial statements filed with registration statements."[77] Second, Galaxy points to SAB 121's language stating that it offers "interpretive guidance for entities to consider when they have obligations to safeguard crypto-assets held for their platform uses," such that it applies, among others, to "private operating companies whose financial statements are included in filings with the SEC in connection with a business combination[.]"[78] And third, Galaxy concludes that BitGo and the Acquisition fall within the scope of SAB 121. Hence, Galaxy holds out that the definition of Company 2021 Audited Financial Statements required BitGo to apply SAB 121.

Responding to BitGo's alternative argument, Galaxy defends the court's interpretation of what it calls SAB 121's "plain language" that required BitGo to apply SAB 121's guidance to the April Submission, concluding that expert testimony was unnecessary.[79] Galaxy also maintains that § 13.01 is inapplicable, as it relates only to scenarios arising *after* BitGo's April or July Submissions (and even then, only if one of them was compliant).[80]

---

[77] *Id.* at 22 (citing 17 C.F.R. Part 210).

[78] App. to Opening Br. at A805; Answering Br. at 18–19.

[79] Answering Br. at 27–29.

[80] Galaxy also claims that BitGo's conduct undercuts its position in two ways: first, BitGo "self-acknowledged" in the April Submission that SAB 121 would be required, and second, BitGo applied SAB 121 to the July Submission as of January 1, 2021. We address these points in II.D.

After considering these respective interpretations, we conclude that the definition of Company 2021 Audited Financial Statements is "reasonably or fairly susceptible of different interpretations."[81] On the one hand, Galaxy's interpretation accords with a common sense reading of the definition's "file-ready" requirement. And Galaxy's interpretation takes SAB 121's "plain meaning" as requiring BitGo to comply with the Bulletin, under "retrospective application," by April 30, 2022. On the other hand, BitGo's interpretation accounts for how the meaning of Company 2021 Audited Financial Statements is qualified by § 1.02 in a way that suggests that SAB 121 was not applicable. And BitGo's interpretation suggests that "retrospective application" did not call for compliance by April 30, 2022. This is not to say that each interpretation is without its own problems; interpretations can be, after all, "reasonable, though problematic[.]"[82] Nor must we determine at this stage which of the interpretations is the "most reasonable." Instead, our task is to determine whether the definition of Company 2021 Audited Financial Statements is "reasonably susceptible of *only one* interpretation."[83] At the pleading stage, it is not.

In the absence of extrinsic evidence bearing on how securities law and accounting principles interact in relation to the Amended Agreement—including, but not necessarily limited to, the meaning of "promulgated" under Regulation S-X

---

[81] *Rhone-Poulenc*, 616 A.2d at 1196.
[82] *Phillips Home Builders*, 700 A.2d at 130.
[83] *Rhone-Poulenc*, 616 A.2d at 1196 (emphasis added).

and "retrospective application"—we hold that dismissal as a matter of law was improper.[84]

## D

To round out our analysis of the adequacy of the April Submission, we address the two remaining grounds that prompted the Court of Chancery to conclude that the submission was noncompliant: BitGo's purported "self-acknowledgement" in the April Submission that SAB 121 was applicable to its financial statements and BitGo's application of SAB 121 in its July Submission.

In its ruling, the court took "into account that [the April Submission] self-acknowledges in the notes that there is a need to comply with SAB 121."[85] The so-called "self-acknowledgement" in the auditor report reads as follows:

> SAB 121 will *likely require* the Company to record an obligation to the balance sheet relating to its obligation to safeguard any crypto-assets held for their platform users and a corresponding indemnification of assets held under custody. The Company is currently evaluating the effect this new guidance will have related to obligations to safeguard crypto-assets, corresponding indemnification assets and its consolidated financial statements.[86]

The day after Galaxy received the April Submission, it seized upon this language and wrote to BitGo, noting—much as the Court of Chancery did in its ruling—"the

---

[84] *See Vanderbilt*, 691 A.2d 609 at 613.
[85] Tr. Ruling at 80.
[86] App. to Opening Br. at A51, A688 (emphasis added).

35

company's acknowledgment in Note 2 that the application of SAB 121 is required."[87]

This characterization of the auditor's note is, in our view, subject to dispute. On its face, the note draws attention to the potential, future—as opposed to the certain, present—applicability of SAB 121. The complaint reveals, moreover, that BitGo promptly responded to Galaxy, maintaining that it "[did] not agree that the financial statements that BitGo delivered last week do not meet the definition of '2021 Company Audited Financial Statements' in the merger agreement."[88] BitGo told Galaxy that it would "cooperate[] in good faith . . . by working to provide retrospective application of SAB 121" but explained to Galaxy its position that "the April 29, 2022 delivery of its Company 2021 Audited Financial Statements was fully compliant with the Amended Agreement and that the End Date remained December 31, 2022."[89] In other words, BitGo made clear its position that SAB 121 did not apply to its financial statements submitted pursuant to the Amended Agreement at the time of the April Submission.[90] By characterizing the auditor's note as a "self-acknowledgement" by BitGo that SAB 121 applied to the April Submission as

---

[87] *Id.* at A699.
[88] *Id.* at A52.
[89] *Id*. at A54.
[90] *Id.*

36

of April 30, 2022, the Court of Chancery appears to have drawn an inference in Galaxy's favor contrary to our Rule 12(b)(6) standards.

We also question the final ground that the court cited in support of its decision. The court observed that "when BitGo later delivered a July version of the same financial statements, BitGo acknowledged its own adoption of SAB 121 as an accounting policy effective as of January 1, 2021[,]" an apparent reference to BitGo's concession that it would retrospectively apply SAB 121.[91]  But on the day of the July Submission, BitGo wrote to Galaxy stating its position that the Company had "previously delivered its 2021 Audited Financial Statements . . . in satisfaction of BitGo's obligation under the merger agreement"[92] and that it had applied SAB 121 in response to Galaxy's request "[i]n the spirit of cooperation—and without waiving any rights regarding prior compliance."[93]

As with the auditor's note in the April Submission,[94] we do not read BitGo's application of SAB 121 to the July Submission as an admission that the April Submission required the application of SAB 121.  Instead, we view BitGo's behavior here, crediting the well-pleaded allegations in the complaint accordingly, with BitGo's desire to accommodate Galaxy, not to admit to past deficiencies.  The

---

[91] Tr. Ruling at 80–81.
[92] App. to Opening Br. at A733.
[93] *Id.* at A733–34.
[94] *Id.* at A54, A64–65.

complaint alleges that BitGo acted in this way in the service of closing a deal that had been pending at that point for over a year. And even if there were doubt as to the import of the July Submission, our Rule 12(b)(6) standard, which requires us to accept the complaint's well-pleaded allegations as true and draw all reasonable inferences in a light favorable to the plaintiff,[95] settles the question in BitGo's favor.

As mentioned above, the Court of Chancery's dismissal of all three counts of the complaint hinged entirely on Galaxy's so-called "clean contractual basis for termination," which relied on the supposed deficiencies in the April and July 2022 Submissions. But that termination right never arose if the April Submission was compliant. The only reason that Galaxy cited for rejecting the April Submission was that BitGo failed to apply SAB 121. If the April Submission failed to comply with the Amended Agreement, then the termination right might yet have been triggered by the July Submission if it, too, were defective. We therefore turn to the issues surrounding the July Submission.

E

First, BitGo claims that the Court of Chancery erred when it held that the July Submission failed to meet the definition of Company 2021 Audited Financial Statements because of the Restriction on Use Legend. Second, BitGo claims that the court erred when it dismissed BitGo's count based on Galaxy's breach of the

---

[95] *In re GGP*, 282 A.3d at 54.

38

commercially reasonable efforts clause in the Amended Agreement. We address these contentions in turn.

BitGo's first argument is grounded in two considerations. First, BitGo points to two provisions of the Amended Agreement that permitted the Restriction on Use Legend—the definition of Company 2021 Financial Statements, which does not expressly prohibit a legend, and § 9.07, which describes, in BitGo's words, the "iterative regulatory process involving the preparation, finalization, approval and dissemination of Galaxy's S-4."[96] The definition of Company 2021 Audited Financial Statements calls for BitGo's auditor to include a report but does not mention the auditor's consent. By contrast, § 9.07(c) requires BitGo to provide its auditor's consent "prior to any filings of an amended" registration statement.[97] BitGo thus claims that the "consent to use the auditor['s] reports in financial statements is both separate from and can be completed later than the delivery of Company 2021 Audited Financial Statements."[98] Because Galaxy had not completed an amended S-4 in July 2022, BitGo advances the view that its auditor would have violated its professional standards of conduct if it provided its consent

---

[96] Opening Br. at 39.
[97] Section 9.07(c) states that BitGo "shall as promptly and practicable furnish to Parent . . . the Company 2021 Audited Financial Statements and prior to any filings of an amended S-4 Registration Statement or S-1 Registration Statement that Parent has determined will include such Company 2021 Audited Financial Statements, as applicable, consents from the independent registered accounting firm[.]" App. to Opening Br. at A218.
[98] Opening Br. at 40.

*before* reviewing the completed amended S-4. BitGo cites its email confirmations to Galaxy both on the day of the July Submission and the next day that BitGo would provide its auditor's consent "'as promptly as practicable after the SEC clarifies its views on accounting for digital asset lending[,]'"[99] the issue on which BitGo had requested that Galaxy seek pre-clearance from the SEC.

BitGo further challenges the Court of Chancery's conclusion that § 9.07 implicated a separate issue. In particular, BitGo questions the court's observation that "[h]aving financial statements with a restriction on use is one thing. Consent to use the financial statements in a Form S-1 is another thing."[100] For BitGo, however, "a restriction on use and consent to use are two sides of the same coin. If consent to use need not happen until later, then there can be restriction (*i.e.*, non-consent) on use beforehand."[101] Put differently, granting the auditor's consent when Galaxy completed the amended S-4 "*necessarily* would require [the auditor] to remove the 'Restriction on Use' legend[.]"[102]

Second, BitGo insists that the Court of Chancery erred by concluding that the 2003 Letter constituted a *de facto* requirement of Regulation S-X.[103] BitGo argues here, much as it did as to SAB 121's applicability to the April Submission under §

[99] *Id.* at 38 (citing App. to Opening Br. at A732–34).
[100] Tr. Ruling at 86–87.
[101] Opening Br. at 40.
[102] *Id.* at 21 (emphasis added).
[103] App. to Opening Br. at A860–61.

40

1.02, that the letter neither mentions Regulation S-X (or its language) nor was it promulgated under Regulation S-X. BitGo also claims that "nothing in Regulation S-X prohibits a restriction on use."[104]

Galaxy counters that the court properly relied on the 2003 Letter. As both the letter and Regulation S-X concern accounting practices related to SEC filings, Galaxy concludes that BitGo's audit report (with its Restriction on Use Legend) ignored SEC rules such that it "plainly [could not] be filed with the SEC to satisfy the Regulation S-X requirement."[105] Namely, the July Submission failed to meet the definition of Company 2021 Audited Financial Statements because it was not immediately ready for use "by any Galaxy investors[.]"[106] Galaxy also recounts that none of BitGo's previously submitted statements (September 2021 and April 2022) had a Restriction on Use Legend.

Galaxy also criticizes BitGo for misreading § 9.07. The main thrust of Galaxy's view is that BitGo conflates an auditor's *report*, which is required under the definition of Company 2021 Audited Financial Statements, and the auditor's *consent*, which is required under § 9.07. To Galaxy, the report and consent serve different ends. Along these lines, Galaxy claims that, because BitGo would be required, once the auditor gave its consent, to reissue its financial statements without

---

[104] Opening Br. at 37.
[105] Answering Br. at 33–34.
[106] *Id.*

41

the Restriction on Use Legend, that fact "demonstrate[d] that [BitGo] had *not* delivered financial statements that could be included in a registration statement filed with the SEC."[107]

Considering these competing interpretations, we conclude once more that the meaning of Company 2021 Audited Financial Statements is ambiguous.[108] That is, neither party has persuaded us that its "interpretation is the *only* reasonable construction as a matter of law."[109] It seems to us that the questions surrounding the auditor's inclusion of the Restriction on Use Legend—like the applicability of SAB 121—implicate the interplay of professional accounting standards and the parties' intentions as to the definition of Company 2021 Audited Financial Statements. From where we sit, we are unable to discern unreasonableness in either party's interpretation of that definition as it relates to the Restriction on Use Legend. The Court of Chancery should therefore consider extrinsic evidence.[110]

F

BitGo's final argument remains in play if the July Submission is found to be deficient.[111] This argument concerns one of two provisions related to the

---

[107] *Id.* at 39.

[108] *See Rhone-Poulenc*, 616 A.2d at 1196.

[109] *Vanderbilt*, 691 A.2d at 613 (emphasis in original).

[110] *See Salamone*, 106 A.3d at 374–75 (examples of extrinsic evidence "may include overt statements and acts of the parties, the business context, prior dealings between the parties, [and] business custom and usage in the industry.") (citation omitted).

[111] *Compare* Opening Br. at 6 *with id.* at 46.

complaint's second count, the dismissed breach of contract claim. Generally, § 9.01 deals with Galaxy's obligations to use commercially reasonable efforts to consummate the transactions.[112] BitGo claims that, "even assuming the 'Restriction on Use' legend violated the requirements for Company 2021 Audited Financial Statements,"[113] the complaint "generates a reasonable inference that Galaxy's refusal to seek pre-clearance prevented BitGo's auditor[] from removing the 'Restriction on Use' legend and therefore *did* 'materially contribute to the failure of the transaction.'"[114] BitGo claims that the court's dismissal is irreconcilable with the prevention doctrine, a doctrine that BitGo says it raised but the court did not address. As BitGo argues, the doctrine means that "Galaxy 'cannot profit from its misconduct' by exploiting a situation it wrongfully created as a basis for termination."[115]

Galaxy defends the dismissal, claiming that seeking pre-clearance was not the only way to resolve the accounting issue. Nor was resolving the issue solely Galaxy's job; BitGo's auditor, Galaxy submits, could have done so. Galaxy thus concludes that the court considered but rejected the prevention doctrine, because "BitGo failed to demonstrate that any action or inaction by Galaxy contributed at all,

---

[112] *See* App. to Opening Br. at A75–77, A208–12.
[113] Opening Br. at 46.
[114] Reply Br. at 25 (emphasis in original) (citing *Williams Cos., Inc. v. Energy Transfer Equity, L.P.*, 159 A.3d 264, 273 (Del. 2017)).
[115] Opening Br. at 44 (citing *Murphy Marine Servs. of Del. v. GT USA Wilm., LLC*, 2022 WL 4296495, at *13 (Del. Ch. 2022)).

much less materially, to BitGo's own failure" to deliver compliant financial statements.[116]

As we read the court's ruling and final judgment,[117] it is unclear whether the court addressed the doctrine. The essence of the court's reasoning is as follows:

> Whether or not [the provisions comprising count II] state a claim in their own right doesn't matter because they don't affect the valid termination right based on the use restriction in the financial statements. These issues may well be separate and unrelated breaches, but because we have a valid termination pursuant to Section 13.1 for the noncompliant financial statements, it is not possible, it is not reasonably conceivable, that these alternative theories could lead to some type of causally resulting damages.[118]

But the "'prevention doctrine' provides that a party may not escape contractual liability by reliance upon the failure of a condition precedent where the party wrongfully prevented performance of that condition precedent."[119] An analysis whether performance may have been "wrongfully prevented" can stand apart from the exercise of a termination right. The court noted this distinction, on the one hand, correctly observing that the breach of contract claims "may well be separate and unrelated breaches" from the termination right, but the court

---

[116] Answering Br. at 45–46.

[117] *Compare* Tr. Ruling at 88–89 *with BitGo Holdings, Inc. v. Galaxy Digital Holdings Ltd.*, 2023 WL 3948788, at *1 (Del. Ch. June 9, 2023) ("Count II fails to state a claim on which relief could be granted because in light of the clean termination right, the alleged breaches of the agreement could not lead to causally related damages.").

[118] Tr. Ruling at 88–89.

[119] *Mobile Commc'ns Corp. of Am. v. Mci Commc'ns Corp.*, 1985 WL 11574, at *4 (Del. Ch. 1985).

overlooked, on the other hand, that the doctrine could still apply. It is therefore unclear to us whether the court did, in fact, apply the doctrine. BitGo argues that, if the Restriction on Use Legend rendered the July Submission noncompliant, then Galaxy's refusal to seek pre-clearance from the SEC breached the contract and materially contributed to the failure of the July Submission,[120] because the lack of pre-clearance was the reason for the Restriction on Use Legend. We decline the invitation to consider whether these allegations implicate the prevention doctrine in the first instance.[121] On remand, if it determines after the consideration of extrinsic evidence that the April and July Submissions were noncompliant, the Court of Chancery should consider whether the doctrine applies.

## III

For the reasons stated above, we reverse the Court of Chancery's June 9, 2023 final judgment[122] dismissing the amended complaint and remand the case for further proceedings consistent with this opinion.

---

[120] *Williams Cos., Inc.*, 159 A.3d at 273–74 ("once a breach of covenant is established, the burden is on the breaching party to show that the breach did not materially contribute to the failure of the transaction. The plaintiff has no obligation to show what steps the breaching party could have taken to consummate the transaction.").

[121] *Northwestern Nat. Ins. Co. v. Esmark, Inc.*, 672 A.2d 41, 44 (Del. 1996) (declining to decide an issue that the trial court did not rule upon in the first instance); *Vanderbilt*, 691 A.2d at 614 n.2 (same).

[122] *BitGo*, 2023 WL 3948788 (Del. Ch. June 9, 2023).